UNITED STATES et al. v. H. P. HOOD & SONS, Inc., et al., and ten other cases.*

Nos. 4519, 4520–4522, 4529, 4530, 4536, 4540, 4543, 4544, 4550.

District Court, D. Massachusetts.

Feb. 23, 1939.

Supplemental Opinion Feb. 27, 1939.

John A. Canavan, U. S. Atty., of Boston, Mass., Robert H. Jackson, Asst. Atty. Gen., and Wendell Berge, Hugh B. Cox, James C. Wilson, and Joseph G. Blandi, Sp. Assts. to Atty. Gen., for plaintiffs.

Charles B. Rugg and Ropes, Gray, Boyden & Perkins, all of Boston, Mass., for defendants H. P. Hood & Sons and another.

Edward F. Merrill, of Skowhegan, Me., for intervening petitioner E. Frank Branon.

John M. Raymond, Lawrence Foster, and Palmer, Dodge, Barstow, Wilkins & Davis, all of Boston, Mass., for defendant Whiting Milk Co.

John W. Redmond, of Newport, Vt., for intervening petitioners Chester D. Noyes, B. A. Gray, and Everett Wiswall.

Charles S. Walkup, Jr., of Boston, Mass., for defendants W. P. Elliott Co., F. W. Laroe, John E. Burr, Whitcomb Farms, Inc., and Mason's Creamery Co.

David Greer, of Boston, Mass., for defendants Green Valley Creamery, A. J. Robinson, W. T. Jones Co., A. J. McNeil & Sons, and Westwood Farm Milk Co.

SWEENEY, District Judge.

Thirty actions filed by the plaintiffs were heard together on the question of a temporary mandatory injunction. This Court entered a decree ordering the defendants to comply with Marketing Order No. 4, as amended, during the pendency of this suit. United States of America, et al. v. Whiting Milk Co., D.C., 21 F.Supp. 321.

The cases were then referred to a special master with directions to hear the parties and their evidence, and to make and report his findings of fact to the Court. Hearings were held beginning on January 4, 1938, and were recently concluded. The Master's report was filed on January 27, 1939.

The only question pertaining to the Master's report is raised by the plaintiffs who object to the inclusion of paragraphs 192 to 218 of the report on the grounds that they are immaterial and irrelevant. Since the defendants raise the question of the validity of Order No. 4, and the proper administration of the amended Order No. 4 by the Marketing Administrator, I am of the opinion that the paragraphs referred to should be included in the report. The Court therefore overrules the objection and confirms the Master's report.

After the injunction was issued, and on application of the defendants, a supersedeas pendente lite was issued by the Senior Circuit Judge of this circuit, staying and superseding the operation of the temporary injunction insofar as it compelled payments by the defendants to the Marketing Administrator, and directing that payments should be made to the clerk of this Court instead, or that a bond should be filed to guarantee such payments. Later, the supersedeas was amended to reinstate the injunction which had ordered payments of administration expenses under Article X of the order to the Administrator. The net result of the action of this Court and the supersedeas was to compel payment of administration expenses directly to the Marketing Administrator, and payments of the equalization charges under Article VIII, and the marketing service charges under Article IX, to the clerk of this Court.

On appeal from the injunction, the Circuit Court ordered that the supersedeas ordered issued by the Senior Circuit Judge should be continued pending the final determination of the cases on their merits. H. P. Hood & Sons, Inc., et al. v. United States, et al., 1 Cir., 97 F.2d 677.

There are now but eleven of the original thirty cases before me for decision. The rest of them are dependent on the decision in these cases, except in one or two instances, where additional testimony is to be taken. This decision will treat the cases as one case, and variations in the facts or law as applicable to any of them will be treated at the end of this opinion.

As a basis for the denial of the relief sought the defendants urge three broad

grounds: First, the unconstitutionality of the Agricultural Marketing Agreement Act of 1937, 7 U.S.C.A. § 601 et seq., hereinafter referred to as the act: second, the invalidity of Order No. 4, both in its original form and as amended: and, third, the improper and illegal administration of Order No. 4, as amended.

■ The constitutionality of the act was passed upon by this Court in United States of America et al. v. Whiting Milk Co., supra. The reasoning and decision in that case are adopted here. In addition to the grounds urged, the defendants now raise one other question—whether the act is unconstitutional because of the improper delegation of legislative power to the Secretary of Agriculture or to a group of private persons. The defendants contend that this Court is bound by the decision of the Circuit Court of Appeals for this Circuit in Butler v. United States, 78 F.2d 1, wherein it held that the Agricultural Adjustment Act of 1933, 7 U.S.C.A. § 601 et seq., was unconstitutional because the Congress improperly delegated legislative power to the executive department. They also contend that even if this Court is not bound to follow the decision in the Butler case, under the doctrine of stare decisis, the act shows a delegation of authority without setting up proper standards as a guide for the exercise of that authority. The defendants' first contention is untenable. The decision of the Circuit Court of Appeals in the Butler case, supra, was a decision on the original Agricultural Adjustment Act. After the Supreme Court of the United States had affirmed the decision of the Circuit Court (without passing on the question of the delegation of legislative authority) the act, including the delegation clause, was amended. As the 1937 act now stands, the delegation clause is quite different from the one passed on by the Circuit Court in the Butler case. The doctrine stare decisis has no application here.

The act contains the following declaration of policy:

"Sec. 2. [§ 602.] It is hereby declared to be the policy of Congress—

"(1) Through the exercise of the powers conferred upon the Secretary of Agriculture under this title [chapter], to establish and maintain such orderly marketing conditions for agricultural commodities in interstate commerce as will establish prices to farmers at a level that will give agricultural commodities a purchasing power with respect to articles that farmers buy, equivalent to the purchasing power of agricultural commodities in the base period; and, in the case of all commodities for which the base period is the pre-war period, August 1909 to July 1914, will also reflect current interest payments per acre on farm indebtedness secured by real estate and tax payments per acre on farm real estate, as contrasted with such interest payments and tax payments during the base period. The base period in the case of all agricultural commodities except tobacco and potatoes shall be the prewar period, August 1909–July 1914. In the case of tobacco and potatoes, the base period shall be the postwar period, August 1919–July 1929.

"(2) To protect the interest of the consumer by (a) approaching the level of prices which it is declared to be the policy of Congress to establish in subsection (1) of this section by gradual correction of the current level at as rapid a rate as the Secretary of Agriculture deems to be in the public interest and feasible in view of the current consumptive demand in domestic and foreign markets, and (b) authorizing no action under this title which has for its purpose the maintenance of prices to farmers above the level which it is declared to be the policy of Congress to establish in subsection (1) of this section." 7 U.S.C.A. § 602.

■ To effectuate the policy of the act, the Secretary of Agriculture is authorized under section 8c(4), 7 U.S.C.A. § 608c(4), to issue an order. Section 8c(5) specifies in detail the terms and conditions of any orders that may be issued, and provides that no other terms and conditions may be contained in such order. A close reading of 8c(5) leads to the conclusion that the power delegated by Congress to the Secretary has not only a definite standard to follow, but has limitations beyond which the Secretary may not go. The standard or criterion that is to govern the exercise of authority given to the Secretary is the levelling of prices for agricultural commodities between the current period and the base period prescribed in the act. It contains a definite and fixed standard to which the Secretary must adhere, and provides the precision of guidance which were pointed out as lacking in

the National Industrial Recovery Act in Schechter Corp. v. U. S., 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947, and Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446. The exact point urged by these defendants was recently passed upon by the Fifth Circuit in Whittenburg, et al. v. U. S., 100 F.2d 520, wherein it was held that the act was not unconstitutional because of an unwarranted delegation of legislative power. To the same effect are Edwards v. U. S., 9 Cir., 91 F.2d 767; Wallace v. Hudson-Duncan, 9 Cir., 98 F.2d 985; and Currin, et al. v. Wallace, et al., 59 S.Ct. 379, 83 L.Ed. —, decided by the Supreme Court of the United States January 30, 1939.

■ The defendants next contend that section 8c(12) of the act amounts to an unconstitutional delegation of legislative authority to a group of producers or to the officers of the cooperative associations having control of the producer vote. This section, and section 8c(19) which permits the Secretary to conduct a referendum for the purpose of determining the sentiment amongst the producers, does not transcend the power of Congress to submit the question of the approval of an order to the producers. Some method or means of ascertaining the sentiment of the producers had to be provided, and the method provided by section 8c(12) and 8c(19) is not arbitrary or capricious. The Master's report contains no indication that if a different method of ascertaining the sentiment of the producers had been used any result other than approval of the amended Order No. 4 would have been obtained. The act is not unconstitutional because of any alleged improper delegation of legislative authority.

■ The defendants attack the constitutionality of the act on another ground. Assuming for the purpose of this attack that Congress has the power to fix a minimum price on milk in interstate commerce, they then urge, citing Thompson v. Consolidated Gas Co., 300 U.S. 55, 57 S. Ct. 364, 81 L.Ed. 510, that the equalization pool authorized by the act operates to deprive those defendants, who dispose of the bulk of their milk at fluid prices, of a portion of their profits, and transfers them to other handlers having less of the fluid market. They contend that it is a taking of their property and giving it to another, a doctrine thoroughly inconsistent with the Thompson case. As I view the facts presented in the Master's report, the defendants' contention is unsound. The effect of this law is not to take profits from one distributor and pay them to another. The real effect is that it takes from the handler the difference between the amount he paid the producers (the blended price is only a minimum price) and the amount he should have paid the producer as ultimately determined by his sales. See Milk Control Board v. Crescent Creamery, Ind. Sup., 14 N.E.2d 588, 590. The facts presented in this case disclose a situation more closely akin to those presented in the New England Divisions Case, 261 U.S. 184, 43 S.Ct. 270, 67 L.Ed. 605, and the Dayton-Goose Creek R. v. U. S., 263 U.S. 456, 44 S.Ct. 169, 68 L.Ed. 388, 33 A.L.R. 472.

The New England Divisions Case held that an order of the Interstate Commerce Commission, which increased the New England share of a joint rate by 15 per cent., was constitutional. Under the order the joint rates were not increased, so that the effect of awarding the New England railroads a 15 per cent. increase necessarily meant that the money constituting the increase must be taken from the roads operating west of the Hudson River. In that decision, the Court recognized the adoption by Congress of a new policy and a new exercise of an old power vested in it. At page 189 of 261 U.S., 43 S.Ct. at page 270, the Court pointed out that the prior enactments of Congress had been concerned chiefly with the prevention of abuses in rates. The new 1920 act, 41 Stat. 456, sought not only to correct abuses, but to insure adequate transportation service. The Court, deciding the order valid, held that, in its control of interstate commerce, the Congress was not limited to mere police duty amongst the railroads, but, to attain the new purpose, could create new rights, new obligations, and new machinery. Again in the Dayton-Goose Creek case, in passing upon the "recapture" phase of the 1920 Transportation Act, the Court denied that the power of Congress to regulate interstate commerce was exhausted by the fixing of reasonable rates and the prevention of those which are discriminatory. In rejecting the narrow construction of the commerce clause, Mr. Chief Justice Taft said: "To regulate in the sense intended is to foster, protect and control the commerce with appropriate regard to the welfare of those who are immediately concerned, as well as the public at large,

and to promote its growth and insure its safety." Dayton-Goose Creek Ry. v. U. S., supra, page 478, 44 S.Ct. page 172.

It is in the interest of those concerned, as well as the public at large, that the marketing of milk flowing in interstate commerce should be regulated. Without regulation, it is simply a question of slow death to those handlers who buy at the blended price and are forced to sell great portions of their commodity at the Class II prices. In Nebbia v. New York, 291 U.S. 502, 517, 54 S.Ct. 505, 507, 78 L.Ed. 940, 89 A.L.R. 1469, the Court said: "A satisfactory stabilization of prices for fluid milk requires that the burden of surplus milk be shared equally by all producers and all distributors in the milk shed. So long as the surplus burden is unequally distributed the pressure to market surplus milk in fluid form will be a serious disturbing factor." This is applicable here.

The regulation and control adopted by Congress eliminates the bad effect of the arbitrary classification of milk for sale either as Class I or Class II milk. The handlers who in the past have had the advantage of disposing of the bulk of their milk at Class I prices have no lien or property right in this preferred market. They cannot corner and hold it against the power of Congress to control the commerce and industry insofar as it affects interstate commerce. They must give way to that power. I rule that the act is not unconstitutional on this ground.

█ The defendants urge at great length that the original Order No. 4 and the amended Order No. 4 are both invalid. Whether or not Order No. 4, issued on February 7, 1936, is invalid, because of the failure to strictly comply with the provisions of the act for notice, hearings and findings, is not material, since the Marketing Agreement Act of 1937, which became effective on June 3, 1937, "expressly ratified, legalized and confirmed" all marketing agreements, licenses, orders, regulations, provisions and acts prior thereto. 7 U.S.C.A. § 672. Amended Order No. 4 became effective after the passage of the 1937 act, and therefore must be examined more closely.

█ In promulgating amended Order No. 4, the Secretary did not make a specific finding and proclamation under section 8e of the act, 7 U.S.C.A. § 608e, to the effect that the pre-war base period could not be satisfactorily determined from available statistics. The defendants contend that the failure of the Secretary to make such a specific finding and proclamation renders the amended order invalid. They insist that, under section 8c(17) of the act, which states: "The provisions [of] * * * section 8e [section 608e of this title] applicable to orders shall be applicable to amendments to orders: * * *" as a condition precedent to the validation of any amended order, it must contain a specific finding and proclamation as to the unavailability of the pre-war base period statistics. I think that the construction urged by the defendants is too narrow and technical. When the Secretary promulgated amended Order No. 4, he ratified and affirmed the original "findings made upon the evidence introduced at the hearings on said order."

Plainly, he intended to ratify every finding that had been made in promulgating his original order save only as they might conflict with the findings of the amended order. (See Paragraph 15 of the Master's report.) A fair reading of the amended order would warrant the conclusion that he affirmed and ratified his finding as to the unavailability of statistics for the pre-war period. This is sufficient compliance with section 8e of the act, 7 U.S.C.A. § 608e. I therefore rule that the amended order is not invalid on this ground.

█ As further matters of defense, the defendants attack the administration of the order. The requests for rulings raise questions of twenty or more allegedly invalid acts of the Administrator. Some of these are trivial. One of the more important allegations is that in his computations, the Administrator has included milk sold to handlers by producers not having a certificate of registration issued by the Commonwealth of Massachusetts. The order defines a producer as "any person * * * who produces milk in conformity with the health regulations which are applicable to milk which is sold for consumption as milk in the Marketing Area."

The master has found that, as a practical matter, it was impossible from the records available to the Administrator to apply the rigid test urged by these defendants. The test that the Administrator applied was whether the country plant to which the milk was delivered by the producer was approved for the shipment of milk into the marketing area by one or

more of the towns and cities in the area. I consider this to have been a practical and satisfactory compliance with the order.

Other bases for alleged errors by the Administrator are the erroneous inclusion of milk which should have been excluded, and the erroneous exclusion of milk which should have been included. In some instances, the Administrator has, as the master found, erroneously included or excluded milk from his computations. But, the act anticipates that the Marketing Administrator would not be infallible, and authorizes the promulgation of Article VII, section 2 and section 3 of the order, which provides for the establishment of a cash reserve fund to be utilized for the correction of errors. The errors detected by the Administrator, or called to his attention, have been corrected insofar as the reports before him have enabled him to do so. (See Paragraphs 184 and 185 of the Master's report.)

The other alleged errors, if proven to be such, may be corrected in the recomputation which is referred to later herein. They do not go to the merits of the validity of the act or to the order, and are not so serious in their nature as to warrant denial of the plaintiffs' claim for relief.

In passing upon a like attack upon a similar statute in Milk Control Board v. Crescent Creamery, supra, referring to the details of operation of an equalization pool, the Court said, at page 590 of 14 N.E.2d: "They are complicated, and involve adjustments to equalize differences between the tentative or announced 'blended price' and the afterward determined 'blended price.' Delinquencies in payments of assessments to the pool also affect the 'blended price,' but there are compensating adjustments when the delinquencies are paid." As in that case, I am satisfied that the method and means adopted by the Administrator to effect the legislative intent do so with a sufficient degree of exactness to satisfy the constitutional requirements. Obviously, in effectuating the policy and purpose of the act much of the detail work must be left to the person charged with the administration. It would be impossible for either the Congress or the Secretary of Agriculture to prescribe rules and regulations that would encompass every situation that can possibly be encountered by the Administrator. He has shown a wholesome and wholehearted willingness to effectuate the intent of Congress without losing sight of or sacrificing any rights that these defendants might have under the Constitution or any law.

If this decision is ultimately sustained, a recomputation of the blended price for every period subsequent to August 1, 1937, will be necessary. Inasmuch as the ultimate blended price of any computation will be dependent upon the amount of Class II milk included in the computation (see Paragraph 189 of the Master's report), it will be necessary, before such recomputation is made, that the Milk Administrator receive reports from all who are bound to comply with the provisions of the order. After such reports have been received from all handlers a new blended price should be determined, using the same class prices that were used in making the original computation for each period, and using the same method of computation.

■ There has been a widespread violation of the act and order, and only a comparative few of the handlers have made the payments provided by the act. These defendants have paid into Court over $2,500,000. The condition of the industry under the circumstances is so chaotic that this Court should do everything possible to obtain a decision by an appellate court on the real questions involved without unnecessary delay. The constitutionality of the act, the validity of the order, and the decision on the question of a mandatory injunction to compel compliance with it, are the vital questions to be finally settled. Ordinarily an equity decree should be an all inclusive decision of the questions that have been raised so that the relief granted will be precise, definite, and comprehensive. In this case it would call for a complete adjudication of the exact amounts owed by each defendant. To allow the final decision on the real questions to be delayed for the period of time that would be necessary to make the recomputation, either administratively or through the Court, and to subject the parties to the incidental expense, would operate to the disadvantage of every person concerned in the case, and possibly to the general public.

I anticipate that if this decision is affirmed in the appellate court the case will be returned to this Court for disposition of the question of the recomputation. In the event, however, that it is ruled that

the act is unconstitutional or the order is invalid, the matter is then ended without need for it.

The plaintiffs are entitled to the injunctions prayed for in the third and fourth paragraphs of their bill, with the understanding on the part of the Court that a recomputation is to be made for every period commencing with August 1, 1937, as soon as practicable after a final decision by the appellate courts on the questions above decided.

A somewhat troublesome situation is presented in the status of the two cents per hundredweight "marketing service fee" deducted under Article IX of the order from the blended price due the producers and paid into Court. This charge is for a service to be currently performed by the Administrator for the benefit of producers. The master has found that it is now impossible for the Administrator to provide the current service for the periods for which he has not received the charge. (See Paragraph 117 of the Master's report.) Under the supersedeas of the Circuit Court the "marketing service fee" was ordered to be paid into the hands of the clerk of this Court. Obviously, the Administrator has been powerless to provide the designated service to the producers. Under the circumstances, it would seem equitable to redistribute that "marketing service fee" to the producers from whom it was withheld by the handlers and paid into Court. When and if an appellate court determines that the "marketing service fee" is a proper charge, and should be paid to the Marketing Administrator, he will then be in a position to render the service and the charge should be exacted. The funds that are paid in the meantime, constituting this service charge, should be turned over to the Marketing Administrator for distribution to the producers from whom the money has been withheld.

The defendants' joint requests for conclusions of law are denied, except insofar as they are consistent with the above. Request #19 has been waived.

### Individual Defendants

### Green Valley Creamery, Inc.

■ In addition to all of the contentions considered above, this defendant asserts that it is not engaged in interstate commerce as that term is defined in the act and is not subject to the regulation provided in the order. This contention is untenable. While it is quite true that the Green Valley Creamery, Inc., sells its milk to the Stuart Milk Company in Vermont, nevertheless, the facts described by the master in Paragraphs 300 to 308 clearly show that the transaction is a questionable one or a "wash" sale. The same Howard B. Parker dominates both corporations, determines the price that the Stuart Milk Company will pay for the milk, and determines what price the Green Valley Creamery, Inc., will receive for the milk. Assuming for the purpose of the defendant's contention, however, that the sale is a bona fide sale, it cannot be urged by the defendant that at the time of the sale by the Green Valley Creamery, Inc., to the Stuart Milk Company that the Green Valley Creamery, Inc., did not have definite knowledge that the commodity being sold was to be sold for transportation in the current of interstate commerce. The contention of the defendant is overruled. See Houston, E. & W. T. R. Co. v. United States, Shreveport case, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341, and Currin, et al. v. Wallace, et al., 59 S.Ct. 379, 83 L.Ed. ——, decided by the Supreme Court of the United States on January 30, 1939. The defendant's request for a contrary conclusion of law is denied.

### A. J. Robinson

■ The master has found that the defendant is a handler of milk as defined in the order, and receives milk from producers at its plant at Starksboro, Vermont. All of the milk purchased by the defendant from the producers is subsequently distributed and sold in the marketing area. There is no question that the milk which the defendant handles is later a part of the flow of interstate commerce, and if the defendant contends that the transaction in which he engages is purely an intrastate transaction, it still directly burdens and affects the flow of interstate commerce, and is therefore subject to regulation by the Congress. See Green Valley Creamery, Inc., supra, and cases there cited. The defendant's requests A and B are denied.

### A. J. McNeil & Sons

■ The master has found that this defendant is a handler as defined in the order. It purchases milk, however, not from producers, but from other handlers. (See Paragraph 314 of the Master's re-

680

port.) This milk is sold and distributed in the marketing area. While the defendant makes no purchases from producers, and is therefore not subject to payment of the blended price, it, nevertheless, is engaged in an activity over which the Congress may validly exercise its authority. It is therefore subject to compliance with the act and order so far as it is applicable. The defendant's request to the effect that the defendant is not indebted to the Marketing Administrator is allowed on the facts disclosed in the Master's report. It is, however, subject to the injunctive relief sought by the plaintiffs.

## The Whiting Milk Company

■ Although the Whiting Milk Company is one of the largest handlers of milk in the area, it raises the intrastate character of certain of its activities as a reason for denying relief to the plaintiffs, at least insofar as these intrastate activities are concerned. Paragraphs 256 and 257 of the Master's report disclose that this defendant purchases milk from producers in Massachusetts for distribution wholly in Massachusetts, and that the processing of the milk occurs separate and apart from the processing of other milk purchased from outside of the state. It is delivered to designated institutions in the Commonwealth of Massachusetts. The surplus not needed for the institutional sale thereafter becomes commingled with other out of state milk. The defendant contends that this milk wholly raised, processed, and sold within the State of Massachusetts is not subject to regulation by the Congress. The master has found (Paragraph 97) that the introduction of as little as 2000 extra quarts of milk into the marketing area might affect the price of milk within the area. There was evidence before him that as little as a carload of milk would drop the wholesale price in Boston as much as 1 cent per day. Clearly, then, it cannot be denied that the milk wholly raised, processed, and sold in Massachusetts does not have a direct effect or burden on the marketing of interstate commerce milk. In Currin, et al. v. Wallace, et al., supra, the Court stated: "The fact that intrastate and interstate transactions are commingled on the tobacco market does not frustrate or restrict the congressional power to protect and control what is committed to its own care." [59 S.Ct. 385.] Citing the Shreveport case, supra, the Court stated:

"Wherever the interstate and intrastate transactions of carriers are so related that the government of the one involves the control of the other, it is Congress, and not the state, that is entitled to prescribe the final and dominant rule." The receipt and handling of the milk by this defendant in the Commonwealth of Massachusetts directly affects interstate commerce, and is clearly and inextricably related with the interstate commerce in milk transactions carried on by the said defendant. It is readily seen that the regulation of interstate commerce in milk cannot be effected without the regulation of the milk in question.

## The Intervenors

■ One producer was allowed to intervene in the Hood action, and another in the Whiting action, on their assertion that they had a real and genuine interest in the proceedings before the Court. Their principal claim of interest is that were it not for the act and order they would be receiving more money for their product than the blended price, and they point to certain plant notices that were posted by these two defendants after the institution of these suits. The notices proclaimed that a price higher than the blended price would be paid to the producers if the defendants were not compelled to comply with the act and order. The intervenors allege that the operation of the act and order deprives them of this increase over the blended price and is violative of the Fifth Amendment to the Constitution. The short answer to these contentions is that the blended price is but a minimum that the handler must pay to the producer, and there is nothing in the act or the order that prohibits the defendants from paying the higher price to the intervenors. It is further to be noted that the plant notices do not constitute such a contract as would enable these intervenors to recover the higher price from the defendants, if the defendants abandoned this litigation. The most that the intervenors have is a contingent interest in the excess over the blended price dependent upon the unconstitutionality of the act or the invalidity of the order. Such interest blossoms into a right, if at all, only after the act has been declared unconstitutional or the order illegal. Plainly, neither the act nor the order constitute a taking of property without due process of law.

Requests for conclusions of law by the intervenors are denied, except insofar as they are consistent with the above.

After the money paid into Court has been released to the Marketing Administrator, these intervenors will be entitled to receive from him a payment, to the extent of moneys deducted from the blended price due them, and paid into Court for marketing service fees under Article IX, as amended.

A decree may be prepared in accordance with the above.

### Supplemental Opinion.

At the request of counsel for the plaintiffs, the following is added to the opinion which was published on February 23, 1939:

Statements of fact above are intended as findings of fact, and statements of legal conclusions, as rulings of law, in accordance with Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

All of the material facts in the case are contained in the Master's report. Insofar as I have dealt with questions of law, my statements in the opinion shall be regarded as conclusions of law for the purpose of the record.