**GREEN VALLEY CREAMERY, Inc., v.
UNITED STATES et al., and four
other cases.**

Nos. 3461–3465.

Circuit Court of Appeals, First Circuit.

Dec. 15, 1939.

David Greer, of Boston, Mass. (Greer, Dalton & Crane, of Boston, Mass., on the brief), for appellants.

John A. Canavan, Asst. U. S. Atty., of Boston, Mass. (Thurman Arnold, Asst. Atty. Gen., and Hugh B. Cox and James C. Wilson, Sp. Assts. to Atty. Gen., on the brief), for appellees.

Before WILSON and MAGRUDER, Circuit Judges, and McLELLAN, District Judge.

MAGRUDER, Circuit Judge.

These were suits in equity brought by the United States of America and the Secretary of Agriculture seeking mandatory injunctions requiring the defendants to comply with the provisions of Order No. 4 as amended, issued by the Secretary under the authority of the Agricultural Marketing Agreement Act of 1937. 50 Stat. 246, 7 U.S.C. § 608c, 7 U.S.C.A., § 608c. The Order regulates the marketing of milk in the Greater Boston Marketing Area. Defendants are dealers in or handlers of milk in that area. Temporary injunctions were issued by the District Court. United States v. Whiting Milk Co., D.C., 21 F.Supp. 321. Upon appeal, these injunctions were stayed in part by an order of supersedeas pending final determination on the merits. H. P. Hood & Sons, Inc. v. United States, 1 Cir., 97 F.2d 677. The District Court referred these cases together with twenty-five others of the same sort to a Master for hearing and findings of fact. The Master's report came in and was duly confirmed by the court, which issued final decrees permanently restraining the numerous defendants from violating any of the terms of Order No. 4 as amended. United States v. H. P. Hood & Sons, Inc., D.C., 26 F. Supp. 672. Thereafter, two of this group of thirty cases, the Hood and Whiting Milk cases, after being docketed on appeal in the Circuit Court of Appeals, went up on certiorari to the Supreme Court, which affirmed the decrees of the District Court. H. P. Hood & Sons, Inc. v. United States, 307 U.S. 588, 59 S.Ct. 1019, 83 L.Ed. 1478. See also United States v. Rock Royal Cooperative, Inc., 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446. In view of the sweeping nature of the Supreme Court's opinions in these cases, this court, upon motion by the Government in the cases now before us, entered an order vacating the supersedeas which the District Court had issued staying in part the operation of its final decrees pending decision on appeal. Green Valley Creamery, Inc. v. United States, 1 Cir., 105 F.2d 754.

Detailed quotations from the Act and the Order are set forth in the opinions of the Supreme Court in the Hood and Rock Royal cases, supra, and need not be repeated here. Article III of the Order sets up classifications of milk according to the use to which it is put, because such use primarily determines the market value of the milk. Class I embraces fluid milk disposed of for consumption in that form as an article of diet. Class II embraces milk disposed of for non-fluid purposes, such as the manufacture of butter or ice cream. Article IV establishes minimum prices to be paid by handlers of Class I and Class II milk, respectively. While in the net result these prices are paid by handlers for the milk that they buy and dispose of, the individual producers do not receive payment on this basis. The Order creates a market-wide pool as an equalization device under which the individual producer is paid a uniform composite price for the milk which he sells, based upon the use made of all the milk sold in the Greater Boston Marketing Area. A Market Administrator computes for each delivery period the use value of the milk sold or used by each handler, multiplying the quantity of such milk in each class by the applicable class price and adding together the two sums (Art. VII, Sec. 1). Then the Administrator combines into one grand total the respective values of the milk sold or used by each handler, and after adjustments for various differentials the adjusted total is divided by the total quantity of milk. The result is a "blended" or uniform price which all producers are to receive for milk deliv-

ered by them during the period, regardless of the use to which any particular milk is devoted.

The blended price is less than the Class I price and more than the Class II price as fixed by Article IV of the Order. A handler who has more than the market average of Class II milk sales during a particular delivery period will have to pay to his producers at the blended price an amount greater than the total amount charged to him as the use value of the milk he has received from producers during that period. Such a handler will therefore be credited with the difference in his producer settlement account on the books of the Market Administrator and becomes entitled to receive from the Administrator an equalization payment out of the pool. On the other hand, a handler who has more than the market average of Class I fluid milk sales during the same delivery period will pay to his producers at the blended price an amount less than the total amount charged to him as the use value of the milk he has received from producers during the period. Such a handler will therefore be debited with the difference in his producer settlement account, and is required by Article VIII, Section 1, of the Order to pay this amount into the pool. Omitting refinements, the debits and credits in the pool should normally balance out in each delivery period.

This market-wide equalization pool is the core of the regulatory scheme set up by Order No. 4 as amended.

Appellants may no longer question the constitutionality of the Act nor the validity of most of the terms of Order No. 4 as amended. H. P. Hood & Sons, Inc. v. United States, 307 U.S. 588, 59 S.Ct. 1019, 83 L.Ed. 1478. Argument was addressed to us on three provisions of the Order which are asserted to be unauthorized by the Act. These points were raised in the District Court in the Hood and Whiting Milk cases but were not pressed before the Supreme Court. Hence, they are still open for consideration here. The portions of the Act now relevant are set forth in the footnote.[1]

---

[1] "Sec. 8c [§ 608c] (Relating to Orders).

(5) "Terms — Milk and Its Products In the case of milk and its products, orders issued pursuant to this section shall contain one or more of the following terms and conditions, and (except as provided in subsection (7) ) no others:

"(A) Classifying milk in accordance with the form in which or the purpose for which it is used, and fixing, or providing a method for fixing, minimum prices for each such use classification which all handlers shall pay, and the time when payments shall be made, for milk purchased from producers or associations of producers. Such prices shall be uniform as to all handlers, subject only to adjustments for (1) volume, market, and production differentials customarily applied by the handlers subject to such order, (2) the grade or quality of the milk purchased, and (3) the locations at which delivery of such milk, or any use classification thereof, is made to such handlers.

"(B) Providing:
"(i) * * *
"(ii) for the payment to all producers and associations of producers delivering milk to all handlers of uniform prices for all milk so delivered, irrespective of the uses made of such milk by the individual handler to whom it is delivered;

subject, in either case, only to adjustments for (a) volume, market, and production differentials customarily applied by the handlers subject to such order, (b) the grade or quality of the milk delivered, (c) the locations at which delivery of such milk is made, and (d) a further adjustment, equitably to apportion the total value of the milk purchased by any handler, or by all handlers, among producers and associations of producers, on the basis of their marketings of milk during a representative period of time.

"(C) In order to accomplish the purposes set forth in paragraphs (A) and (B) of this subsection (5), providing a method for making adjustments in payments, as among handlers (including producers who are also handlers), to the end that the total sums paid by each handler shall equal the value of the milk purchased by him at the prices fixed in accordance with paragraph (A) hereof.

*    *    *    *    *    *

(6) "Terms — Other Commodities

*    *    *    *    *    *

(7) "Terms Common To All Orders In the case of the agricultural commodities and the products thereof specified in subsection (2) orders shall contain one or more of the following terms and conditions:

*    *    *    *    *    *

"(D) Incidental to, and not inconsist-

Article IV of the Order provides for two sets of minimum prices, one to be applicable if the purchase is from an association of producers, and the other if the purchase is from producers not members of an association. It is contended that under Section 8c (5) (A) of the Act the minimum price must be uniform, subject only to certain adjustments therein set forth, none of which is dependent upon the class of producers from which the milk is received. In promulgating the Order the Secretary of Agriculture found as a fact, upon evidence introduced at the administrative hearings, "that the differential in prices to associations of producers, and producers, is justified as a reasonable allowance for services actually performed by associations of producers." It is not denied that there was evidence before the Secretary warranting a finding that such a differential had customarily been applied in the market area, for the reason that milk purchased from associations of producers has an enhanced value due to the fact that many marketing services have already been performed by such associations. In view of these facts, we think that the Government is right in its contention that this differential in prices applicable to milk received from producers and milk received from associations of producers is authorized by Section 8c (5) (A) (1) of the Act as a market differential customarily applied by handlers. The phrase "market differential," undefined as it is in the Act, is reasonably susceptible of such an interpretation. If further support for this conclusion were needed, it would be found in the fact that the Secretary in promulgating the original Order No. 4 on February 9, 1936, construed Section 8c (5) (A) of the Agricultural Adjustment Act of 1933, as amended (49 Stat. 754), as authorizing such a differential in price as between producers and associations of producers, and Congress subsequently re-enacted without amendment this portion of that Act in the Agricultural Marketing Agreement Act of 1937. 50 Stat. 246. It is hardly significant that this particular price differential is not specifically called a market differential in the Order.

Next, the appellants take exception to a provision of Article VII, Section 2 of the Order, specifying the method of computing the blended or uniform price. This section excludes from such computation the milk of handlers who are in default in the required equalization payments "for milk received during the delivery period next preceding but one." Each month is divided into two delivery periods. By Article VII, Section 7, the Administrator is required to compute and announce on or before the twelfth day after the end of each delivery period the blended price applicable for that period. Handlers are not required to make the payments required by Article VIII until the twenty-fifth day after the end of each delivery period. Therefore, at the time the Administrator computes the blended price for the preceding delivery period, handlers are not yet in default in respect to that period. For this reason the Order requires the Administrator to ascertain whether a particular handler is in default on payments required for milk received during the delivery period next preceding but one. If such delinquency exists, the milk of that handler is excluded from the current computation of the blended price. The purpose of this provision seems to be to minimize the risk that the equalization pool will fail to be self-liquidating for a particular delivery period on account of defaults by handlers obligated to the pool in the manner previously described in this opinion. "If a handler has so failed in one delivery period it is reasonable to expect that he may repeat his failure in the next."

The Act does not specify the detailed method by which a blended or uniform price is to be computed. The method adopted in Article VII of the Order seems reasonably adapted to promoting the successful operation of the equalization pool, which, in turn, is a device calculated to insure the payment to producers of uniform prices for all milk delivered to handlers, irrespective of the uses made of such milk by the individual handler to whom it is delivered (Act, Sec. 8c (5) (B) (ii)). Defaulting handlers are subject to penalties in the Act, and though their milk has been excluded from the computations of the pool, they are nevertheless liable to pay their producers at the announced blended price. If they later made good their pool debits, such payments will be reflected in an in-

---

ent with, the terms and conditions specified in subsections (5), (6), and (7) and

necessary to effectuate the other provisions of such order."

creased blended price for a later delivery period.

In addition to what has been said, it is questionable whether these appellants are in a position to attack the validity of the provisions of the Order dealing with the computation of the blended price. While the exclusion of milk of a defaulting handler may affect the blended price, the Master points out that the level of the blended price does not affect in any way the total charge to handlers participating in the pool, which is computed not on the basis of the blended price but rather on the basis of the minimum prices fixed in Article IV of the Order for the milk a handler receives from producers in a particular delivery period.

■. Appellants further challenge the validity of certain differentials provided for in Article VIII, Section 4, paragraphs 3 and 4, of the Order. The section is set forth in the footnote.[2] It is argued that differentials based upon the location of the farms of producers are not authorized by Section 8c (5) (B) (ii) (c) of the Act, which authorizes only differentials based upon "the locations at which delivery of such milk is made." [3] There was evidence before the Secretary to the effect that similar differentials in favor of nearby farms had existed in the Boston market for many years. Various factors were mentioned as accounting for this, including their greater accessibility to the market, and their greater dependability as sources of supply, because, as experience showed, the nearby farms had a more uniform level of production throughout the year. These producers were also potential dealers, who might establish their own milk routes in competition with handlers in the Boston market, if prices were not acceptable. Whatever the explanation, this group of producers in fact commanded somewhat more favorable prices for their fluid milk as against producers more remotely located. The differentials now objected to were inserted in the Order so as not to disturb the status quo in this respect. Milk entering the Boston market from nearby farms is presumably delivered to handlers at points nearby the market; and thus, paragraphs 3 and 4 of Section 4, Article VIII, may be said to prescribe differentials having relation to locations at which deliveries are made. This argument need not be labored, however, for the differentials can readily be sustained under Section 8c (5) (B) (ii) (a) of the Act as market differentials which had customarily been applied by handlers subject to the Order. They are called "location differentials" in the Order, and so they are; but they are also customary market differentials based upon the location of farms nearby the market.

Here again it may be observed that similar differentials were contained in the original Order No. 4, effective February 9, 1936, under an administrative interpretation of provisions of the Agricultural Adjustment Act of 1933, as amended (49 Stat. 750), which were re-enacted without change in the Agricultural Marketing Act of 1937.

■ Furthermore, we think the Government is right in its contention that the present appellants have no standing to challenge the Order in this particular. These differentials in favor of nearby farms do

[2] "Sec. 4. Location Differentials.—The payments to be made to producers by handlers pursuant to paragraph 1 of section 1 of this article shall be subject to differentials as follows:

"1. With respect to milk delivered by a producer to a handler's plant located more than 40 miles from the State House in Boston, there shall be deducted an amount per hundredweight equal to the freight (considering 85 pounds of milk per can), according to the tariff currently approved by the Interstate Commerce Commission for the transportation, in carload lots of milk in 40-quart cans, to Boston from the zone of location of the handler's plant.

"2. With respect to milk delivered by a producer to a handler's plant located not more than 40 miles from the State House in Boston, there shall be added 18 cents per hundredweight.

"3. With respect to milk delivered by a producer, whose farm is located more than 40 miles, but not more than 80 miles, from the State House in Boston, there shall be added 23 cents per hundredweight.

"4. With respect to milk delivered by a producer, whose farm is located not more than 40 miles from the State House in Boston, there shall be added 46 cents per hundredweight unless such addition gives a result greater than $3.19, in which event there shall be added an amount which will give a result of $3.19."

[3] See footnote 1, supra.

not affect the net cost of the milk to handlers, computed on the basis of the minimum prices established in Article IV of the Order. They are adjustments affecting only the distribution among producers out of the equalization pool.

█ Several additional points were urged in appellants' brief. They all assumed the validity of the Act and of the Marketing Order, and related merely to details of administration as to which it was contended that the Market Administrator did not follow the terms of the Order. Only in the exceptional case of manifest error should a court undertake to upset interpretations of a highly technical administrative order made by the responsible official to whom has been delegated the administration of the order. This is especially true where, as in this case, the Act provides machinery whereby any handler subject to the Order may obtain administrative review by the Secretary of Agriculture of the actions of the Market Administrator. At the oral argument, counsel for appellants stated that they would not ask us to pass upon these points of administrative detail but that they proposed to apply to the Secretary of Agriculture for a review on these points under Section 8c (15) (A) of the Act. Accordingly we do not now examine into them.

█ It is further urged by appellants that the decree of the District Court should be reversed for failure of the court to make findings in accordance with Rule 52 (a) of the new Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. The court confirmed and adopted as its own the findings of fact set forth in numbered paragraphs of the Master's report. In respect to conclusions of law the court stated, 26 F.Supp. 672, 681: "Insofar as I have dealt with questions of law, my statements in the opinion shall be regarded as conclusions of law for the purpose of the record." The decree should not be reversed for this reason, and under the circumstances no useful purpose would be served by remitting the case for a more formal statement of the district judge's conclusions of law. H. P. Hood & Sons, Inc. v. United States, 307 U.S. 588, 59 S.Ct. 1019, 83 L.Ed. 1478.

In each case: The decree of the District Court is affirmed.