### PARKER v. UNITED STATES et al.
### No. 3790.

Circuit Court of Appeals, First Circuit.
April 13, 1943.

---

corporation to comply with the provisions of Order No. 4, as amended, issued by the Secretary of Agriculture pursuant to the provisions of the Agricultural Marketing Agreement Act of 1937, 50 Stat. 246, 7 U.S.C.A. § 601 et seq. As reparation for the contempt, the order now under review imposed a compensatory fine upon Parker for the benefit of the market administrator, in the sum of $42,236.74, and directed payment of this sum within ten days, in default of which it was directed that Parker be committed to jail until payment was made, or until further order of the court.

The final decree in the equity suit was upheld by us in Green Valley Creamery, Inc., v. United States, 1 Cir., 1939, 108 F. 2d 342. In our opinion in that case pertinent portions of the Act are quoted, the terms of Order No. 4 as amended are summarized, and a description is given of the producer-settlement account or equalization pool by means of which each producer of milk receives a so-called "blended price" computed by the market administrator as directed in the Order, regardless of the use to which the particular milk may have been devoted. See also United States v. Rock Royal Co-operative, Inc., 1939, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446; H. P. Hood & Sons, Inc., v. United States, 1939, 307 U.S. 588, 59 S.Ct. 1019, 83 L.Ed. 1478.

The contempt proceedings growing out of the equity suit were before this court at an earlier stage, upon appeal from an order of the court below dated January 27, 1941, adjudging Parker in civil contempt and committing him to jail until Green Valley Creamery, Inc., should effect compliance with the Act and with the mandatory injunction theretofore issued against the said corporation. Parker v. United States, 1 Cir., 1942, 126 F.2d 370; we refer to our opinion there for a fuller statement of the case. Appellant did not challenge the findings of fact by the master, duly confirmed by the district court, dealing with the alleged contemptuous conduct. We set aside the contempt order of January 27, 1941, for the reasons stated in our opinion. But we ruled that on the record Parker should be adjudged in civil contempt both of the interlocutory and final decrees and that a compensatory fine should be imposed upon Parker to make good the loss caused to the market administrator by Parker's contumacious acts; and we remanded the case to the district court with directions to impose such a fine upon Park-

Richard Wait, of Boston, Mass., for appellant.

Joseph P. Rooney, Asst. U. S. Atty., of Boston, Mass. (Edmund J. Brandon, U. S. Atty., of Boston, Mass., and John S. L. Yost, Sp. Asst. to Atty. Gen., of counsel), for appellees.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

MAGRUDER, Circuit Judge.

Appeal is taken here from an order of the district court dated June 16, 1942, adjudging Howard B. Parker in civil contempt of an interlocutory and of a final decree, both rendered in an equity suit brought by the United States of America and the Secretary of Agriculture against Green Valley Creamery, Inc., to obtain a mandatory injunction requiring the said

er, the amount to be determined with due regard to the guides laid down in our opinion. Upon motion of the plaintiffs, the court below, in compliance with our mandate, proceeded to issue the order from which the present appeal is taken. Our opinion on Parker's application to be admitted to bail pending decision on this appeal is reported in Parker v. United States, 1 Cir., 1942, 129 F.2d 374.

Appellant does not take issue with our ruling of law on the earlier appeal to the effect that Parker should be adjudged in contempt of the interlocutory and final decrees and should be subject to a remedial fine in some amount. The only point raised is that the district court did not follow the directions in our mandate in fixing the amount of the fine.

Parker's contempt of the court decrees had to do with his manipulation of the affairs of two corporations which he controlled, Green Valley Creamery, Inc., and Stuart Milk Company.

Stuart Milk Company is a corporation duly organized since 1921 under the laws of Massachusetts. It has a usual place of business in Somerville, Massachusetts, and has been engaged in the business of selling milk to consumers within the Greater Boston Marketing Area. Howard B. Parker is the treasurer, general manager, and a director of Stuart Milk Company and owns 200 shares of its capital stock. The remaining 300 shares are owned by his father, Arthur B. Parker, who is also a director. The third director is Alfred E. Collinson. The business of Stuart Milk Company was dominated by Howard B. Parker; the company, by vote of its stockholders, approved, ratified and confirmed the acts and proceedings of the directors and officers.

Originally, the Stuart Milk Company owned a country plant or receiving station at Passumpsic, Vermont, where it made purchases of milk directly from producers. Had this remained the situation, Stuart would have come under obligation to make payments to the market administrator under the provisions of Order No. 4 as amended. On March 15, 1934, federal regulation of the marketing of milk in the Greater Boston Area was begun by the issuance of License No. 38 by the Secretary of Agriculture under authority conferred on him by § 8(3) of the Agricultural Adjustment Act, 48 Stat. 35. See United States v. Seven Oaks Dairy Co., D.C.Mass. 1935, 10 F.Supp. 995. Thereafter, in October, 1934, Green Valley was organized under the laws of Massachusetts with a usual place of business in Somerville, Massachusetts. Within a few weeks thereafter Green Valley purchased the plant at Passumpsic, Vermont, from Stuart for an unknown amount of cash and a $9,000 mortgage. This mortgage was foreclosed early in 1938, after which the said plant, though back in the ownership of Stuart, continued to be operated by Green Valley.[1]

All the capital stock of Green Valley was owned by Howard B. Parker, who was its treasurer and general manager, in addition to being a director, and he dominated its business during the entire period in question.

Parker's method of operation is fully set forth in the master's report. Green Valley bought the milk from producers. Its entire product was then sold to Stuart. Parker, as the dominating man in both corporations, dictated the prices at which Green Valley should sell and Stuart should buy. Under the direction and management of Parker the bills from the market administrator to Green Valley were not carried as accounts payable by Green Valley, whose operating accounts were balanced without including therein the bills of the market administrator. By Parker's dictation, the prices for milk sold to Stuart by Green Valley "were established and adjusted after disregarding the sums due to the market administrator and the amounts of the bills received by Green Valley Creamery, Inc., from the market administrator." These prices were so nicely set by Parker in 1938 "that the total receipts of Green Valley Creamery, Inc., were maintained at a level substantially sufficient to balance the books of Green Valley Creamery, Inc., without consideration of the sums due from Green Valley Creamery, Inc., to the market administrator." If, however, the amounts due the market administrator are included (as of course they should be) as part of the cost of the milk to Green Valley, it is found by the master that as a result of Parker's domination "Stuart Milk Company was enabled to purchase the entire products of Green Valley

[1] The facts stated in this paragraph appear in the report of the special master in the injunction proceedings, No. 3461. Green Valley Creamery, Inc. v. United States, 1 Cir., 1939, 108 F.2d 342.

Creamery, Inc., for the period between August 1, 1937, to December 31, 1939, at $47-072.65 less than the total costs of such products to Green Valley Creamery, Inc."

It is quite evident that Parker did not maintain his wholly owned corporation, Green Valley Creamery, Inc., for the legitimate purpose of conducting a milk business for profit; rather, as the master found, it was "operated and controlled for the benefit of Stuart Milk Company." It served as a buffer between Stuart Milk Company and the market administrator, for the Stuart Milk Company, purchasing its milk not directly from producers but from a handler, would not be obligated to make payments into the equalization pool operated by the market administrator under the Order. Parker was within his rights in testing the constitutionality of the Act, but he was at pains to see to it that Green Valley Creamery, Inc., should not have on hand assets wherewith to discharge its obligations to the market administrator if the Act should eventually be upheld, as in fact it was. The maintenance of the uniform blended price to each producer, whether or not his milk goes predominantly into the fluid milk market, is impossible unless handlers who have more than the market average of the fluid milk sales make the prescribed equalization payments into the pool. The Act and the Order seek to achieve a fair division of the more profitable fluid milk market among all producers, thereby eliminating the disorganizing effects which had theretofore been a consequence of cutthroat competition among producers striving for the fluid milk market. This is clearly set forth in the opinion in United States v. Rock Royal Co-operative, Inc., 1939, 307 U.S. 533, 548–550, 59 S.Ct. 993, 83 L.Ed. 1446.

The interlocutory injunction against Green Valley Creamery, Inc., in the equity case was issued on November 30, 1937. Among other things it commanded the corporation, "its agents, officers, employees, successors and assigns", to comply with all of the provisions of Order No. 4, as amended, during the pendency of the suit or until a further order of the court. Pending appeal therefrom this court issued a supersedeas staying in part the operation of the mandatory injunction, upon condition, however, that the amounts then due or to become due thereafter should, until final determination on appeal of the case on its merits, be paid into the registry of the dis-

trict court. Parker ignored the condition of the supersedeas and made no payments into the registry. He continued to conduct the affairs of the two corporations as before, causing his wholly owned corporation to pile up further current indebtedness to the market administrator, which evidently such corporation would not have the funds to pay. The same thing happened after the district court's final decree of March 15, 1939, which again ordered Green Valley Creamery, Inc., its agents, officers and employees, to comply with all the provisions of Order No. 4, as amended. The district court, pending appeal from this final decree, issued a supersedeas similar in terms to the one we had entered at the earlier stage. Parker ignored the condition of this supersedeas also, and made no payments into the registry of the court. Further indebtedness by Green Valley to the market administrator was thereafter incurred, with no prospect that Green Valley would have the funds to pay it. We affirmed the final decree on December 15, 1939.

After a hearing by the master on petition for attachment of Parker for contempt, the master found that the payments by Stuart to Green Valley "were so regulated under the management and direction of Howard B. Parker that Green Valley Creamery, Inc., on December 31, 1939, was insolvent." Further, the master recited:

"Upon all the evidence I find that the policies, acts and domination of Howard B. Parker have caused the assets and the income of Green Valley Creamery, Inc., to be so held, that Green Valley Creamery, Inc., has been made incapable of paying from the sums or assets now in the possession of Green Valley Creamery, Inc., the amounts due the market administrator.

"I find that the domination and management of Howard B. Parker and the acceptance thereof by Green Valley Creamery, Inc., and Stuart Milk Company, and by the officers and directors of both companies, have made Green Valley Creamery, Inc., immediately and directly unable, from assets now in the possession of Green Valley Creamery, Inc., and noted upon its books of account, to comply with either the temporary injunction or the said decree."

The master also made a specific finding as to the purpose actuating Parker in the described course of conduct:

"I find that the acts of Howard B. Parker and the acceptance thereof by the directors

and officers of both Green Valley Creamery, Inc., and Stuart Milk Company, all as hereinabove more fully set forth, have been undertaken for the purpose of placing funds and assets beyond the reach of the market administrator, and that these acts were carried on for the purpose of hindering and delaying the market administrator."

Under these circumstances we ruled on the earlier appeal that Parker was personally in contempt of the interlocutory and final decrees and that a compensatory fine should be imposed upon him to make good the loss he had caused to the market administrator.

We stated that a command to a corporation is in effect a command to those who are officially responsible for the conduct of its affairs, citing Wilson v. United States, 1911, 221 U.S. 361, 376, 31 S.Ct. 538, 55 L.Ed. 771, Ann.Cas.1912D, 558; that where the responsible officers of the corporation after notice of the decree merely fail to take action within their power to cause the corporation to comply with the decree, the officers are in civil contempt, but the obligations of the corporation under the decree do not thereby become the personal obligations of the delinquent officers; that the officers may be committed to jail for civil contempt merely as a means of forcing them to effect compliance by the corporation, and if they can show that the corporation is no longer able to comply with the decree and that its inability is not due to any contumacious acts of theirs, they will be entitled to discharge from commitment.

But we went on to point out that we did not have before us the ordinary situation where a corporate officer is committed for civil contempt upon non-compliance by the corporation with a court decree:

"Howard B. Parker has done more than merely fail to cause compliance by Green Valley with the interlocutory and final decrees. By a studied course of conduct over a long period of time he has deliberately rendered Green Valley incapable of complying with the said decrees, as indicated in the master's report. From this it does not follow that the obligations of Green Valley to the market administrator become as such the personal obligations of Parker. But to the extent that Parker's contumacious acts have had the intended effect of causing loss to the market administrator by depriving him irretrievably of the fruits of the decrees against Green Val-

ley, the district court has power, in a civil contempt proceeding, to impose a monetary fine upon Parker, payable to the market administrator."

For the guidance of the district court upon remand we then discussed the evidence as bearing on the appropriate amount of the compensatory fine, as follows:

"The master found that the total amount due from Green Valley to the market administrator for the period from August 1, 1937, to March 30, 1940, was $41,722.37. He also found that due to the pricing policy enforced by Parker, Stuart purchased the milk from Green Valley from August 1, 1937, to December 31, 1939, at $47,072.65 less than its actual cost to Green Valley. But the latter sum includes losses incurred by Green Valley by reason of prices fixed prior to the interlocutory decree of November 30, 1937. The acts of Parker prior to November 30, 1937, however much they may have contributed to Green Valley's insolvency, are necessarily not in contempt of the interlocutory or final decree. See Ex parte Buskirk, 4 Cir., 1896, 72 F. 14; Berry v. Midtown Service Corp., 2 Cir., 1939, 104 F.2d 107. In determining the extent of the compensatory fine to be imposed upon Parker, the district court should consider only losses resulting from prices established by Parker after the rendition of the interlocutory decree. On the other hand, the court will be entitled to take into account the further losses resulting from Parker's pricing policy for the period from January 1, 1940, to March 30, 1940, as to which no figures appear in the record before us. Since the fine is compensatory it should as a maximum be no larger than the aggregate amount due the market administrator from Green Valley, with interest."

We had in mind the purpose for which Green Valley Creamery, Inc., was maintained and operated by Parker, as above stated. When Parker, in the face of the interlocutory and final decrees, continued to cause Green Valley's milk to be sold to Stuart at less than cost, to that extent he was making sure that Green Valley would not have in its hands the necessary funds to pay the indebtedness to the market administrator incurred after the date of the interlocutory decree, which under the terms of the supersedeas ought to have been paid into the registry of the court to await the outcome of the litigation. Parker's course of conduct had the intended effect; after

the litigation terminated in favor of the Government, Green Valley was without funds to satisfy its obligations to the market administrator and ended up in voluntary bankruptcy. Meanwhile, Stuart Milk Company had obtained a competitive advantage by getting its milk from Green Valley at a cheaper price than it would have had to pay for purchases from other handlers who, presumably, would have taken account of their obligations to the market administrator as part of their costs.

The district court, in determining the amount of the compensatory fine, followed the directions in our mandate. The total amount due from Green Valley Creamery, Inc., to the market administrator for the whole period from August 1, 1937 to March 30, 1940, with interest added, and with the deduction of a credit of $734.95 allowed by the market administrator after the master had made his findings, was $48,903.41. This, we stated, would be the outside limit of the compensatory fine. The district court started with the figure of $47,072.65, which was the amount which the master found as representing the loss to Green Valley from August 1, 1937 to December 31, 1939 resulting from the sale of its milk to Stuart at less than its actual cost to Green Valley. From this, the court deducted $4,100.96, being the amount of such loss suffered by Green Valley prior to the date of the interlocutory decree of November 30, 1937. The court also deducted the credit of $734.95 above mentioned; the Government raises no question as to the propriety of this deduction. The resulting figure of $42,236.74 was the amount

of the compensatory fine imposed by the court.[2]

Appellant concedes that to the extent that Parker as the dominant man in the two corporations so manipulated the prices that Green Valley got less than fair market value for the sale of its milk, his action denuded Green Valley of assets which it otherwise would have had available to pay its debts to the market administrator; and he argues that this is the proper measure of the compensatory fine. The master found, in this connection, that during the whole period from August 1, 1937 to December 31, 1939, Stuart was enabled by Parker's pricing policy to purchase Green Valley's milk at $26,973.30 less than such products might have been purchased from other handlers; and he took the prices at which Stuart might have purchased such milk from other handlers as determinative of the fair market value of the milk it purchased from Green Valley.[3] Parker is liable at least for this amount, diminished by so much of the loss as occurred before the date of the interlocutory decree. But we do not think that this is the true measure of his liability. In our opinion on the previous appeal we did not mention this finding of the master as to market value because we regarded it as not material to our disposition of the case.

The argument is that when a court decree lays a command upon a corporation, the corporate officers are obligated to bring about a compliance with the decree only to the extent that it is within the power of the corporation to comply; that Parker could not be expected to get more for the

[2] In our opinion on the previous appeal we pointed out that the district court would be entitled to take into account the further losses resulting from Parker's pricing policy from the period from January 1, 1940 to March 30, 1940, as to which no figures appeared in the record. Upon remand the Government introduced no evidence on this point, being content to waive any claim for increase of the fine in this particular.

[3] Appellant devotes the greater part of his brief to the contention that this finding does not mean what it seems to mean; that purchases from other handlers would have been made in the Greater Boston Marketing Area with prices increased by the amount of shipping costs from producing points to Boston; that if there is added to the prices paid to Green Valley for delivery of its milk at Passumpsic, Vermont, the cost of transporting such milk to Boston, it would appear that the deficit is reduced to a much lower figure. This contention involves a complicated series of computations and an analysis of the master's findings as a whole in the light of the exhibits in the record. In the view we take of the case it is not necessary to make an extended analysis of this contention by appellant. We are convinced, however, from an examination of the record that the Government is right in maintaining that the above figure of $26,973.30 represents the aggregate amount by which the prices received by Green Valley for delivery of its milk at Passumpsic, Vermont, was less than the fair market value of the milk at that point; otherwise, the master's finding would be meaningless.

sale of Green Valley's milk than its fair market value; that if the sale of Green Valley's milk at fair market value still would not have realized sufficient funds wherewith to pay the continually mounting indebtedness to the market administrator in full, Parker ought not to be faced with the alternative of having to suspend the business operations of Green Valley or else come under a personal liability for the deficit.

Perhaps this argument would be valid as applied to a corporation operating a business in a bona fide manner. Such was not the case here. As we have stated, the only function of Green Valley was to serve as a buffer between the market administrator and Stuart Milk Company—a convenient instrumentality for hindering and delaying the market administrator. Disregarding the interlocutory and final decrees, Parker continued to utilize Green Valley for the purpose aforesaid, incurring further indebtedness to the market administrator, selling the milk to Stuart at prices below cost, and to that extent accomplishing the intended result of rendering Green Valley incapable of complying with the court decrees.

The order of the District Court is affirmed.