## RAYMOR BALLROOM CO. et al. v. BUCK et al.

### No. 3537.

Circuit Court of Appeals, First Circuit.
March 15, 1940.

[6] Wack v. Schoenberg Mfg. Co., 331 Mo. 197, 53 S.W.2d 28; Scanlon v. Kansas City, 336 Mo. 1058, 81 S.W.2d 939.

J. C. Johnston, of Boston, Mass., for appellants.

Samuel Berkett, of Boston, Mass. (Guterman & Guterman, of Boston, Mass., on the brief), for appellees.

Before MAGRUDER, Circuit Judge, and PETERS and FORD, District Judges.

MAGRUDER, Circuit Judge.

This is an appeal from a decree of civil contempt, arising out of an equity suit for copyright infringement. Buck v. Raymor Ballroom Co., D.C., 28 F.Supp. 119.

On February 14, 1938, the plaintiffs commenced in the District Court a suit in equity against the defendants Raymor Ballroom Company and Raymond J. Galvin, for copyright infringement by public performance for profit of certain musical compositions. Thereafter, on March 16, 1938, the bill of complaint was taken pro confesso as against the defendants named therein. In the final decree, entered May 9, 1938, the defendants were perpetually enjoined from further infringement; and it was further ordered and adjudged that the plaintiffs recover of the defendants the sums of $500 as damages and $100 as attorneys' fees. No appeal was taken from this decree.

So far as appears, the defendants obeyed, and have continued to obey, the injunction. Enforcement became necessary only in respect to the remaining portion of the decree, awarding money damages and costs. To this end a writ of execution in the sum of approximately $600 was issued out of the District Court on May 25, 1938. This was an appropriate process. Equity Rule 8, 226 U.S. 651, 28 U.S.C.A. following section 723; 28 U.S.

C. § 377, 28 U.S.C.A. § 377; Pease v. Rathbun-Jones Engineering Co., 5 Cir., 228 F. 273, affirmed, 243 U.S. 273, 37 S.Ct. 283, 61 L.Ed. 715; Western Pocahontas Corp. v. Acord, 4 Cir., 1910, 178 F. 843.

The amount of the execution was not paid and the writ was placed in the hands of the marshal for levy. On September 17, 1938, and October 11, 1938, deputy marshals went to the corporate defendant's ballroom for this purpose. They did not succeed, due to various acts of Galvin, the treasurer and active manager of the corporation, aided and abetted by several subordinate employees, Ave Galvin Demers, a sister of the defendant Galvin, MacLean and Garnett, special policemen employed by the defendants on the ballroom premises, and one Leonard, who described his job as "a little bit of everything".

The findings of fact of the District Court, as to what occurred on the two occasions when the deputy marshals sought to make a levy of execution, are set forth in the footnote. [1]

Thereafter the plaintiffs filed a petition in the District Court praying that the defendants Raymor Ballroom Company and

[1] "The Raymor Ballroom is a large public ballroom located on Huntington Avenue near its intersection with Massachusetts Avenue in the City of Boston. Its capacity is between one thousand and eleven hundred persons. On both of the occasions when the alleged contempts occurred it was being operated by the defendant Raymor Ballroom Company. The defendant Raymond J. Galvin was the treasurer of this corporation. The other defendants were employees thereof. They are Ave Galvin Demers, a sister of the defendant Galvin, MacLean and Gannett (the true name of the latter being Garnett), who were special policemen, and one Leonard, who was employed at odd jobs.

"On the evening of September 17, 1938, arrangements were made for Deputy Marshal Daniel J. Chapman to go to the ballroom and attempt to satisfy the execution. He, accompanied by Dr. Donald Skuse and Mr. Paul Skuse, who were brought along in case it should prove necessary to employ a keeper, met Mr. Berkett, attorney for the plaintiffs, and Mr. Russell W. Rome, their local representative, at a point near the ballroom at about 9:20 p. m. Deputy Marshal Chapman, accompanied by Donald and Paul Skuse, then went to the Raymor Ballroom and asked for Mr. Galvin. When Galvin appeared, Deputy Marshal Chapman stated his mission and demanded payment of the execution. The defendant Galvin then invited Chapman to step into his private office, which he did, leaving both Donald and Paul Skuse to watch the ticket window. At that time about two hundred dollars in small bills were visible through the window. After entering the private office, Galvin stated that the dance hall was no longer operated by the defendants but was operated by 'The Boston Amusement Company', a Massachusetts corporation. In fact, this was untrue. The dance hall was being operated by the defendants and there was no such corporation as The Boston Amusement Company. While Chapman was in the office, a boy dressed in a clerk's coat walked up to the box office and the cashier passed him a bag of money. When asked his business, he replied, 'The boss sent me out for the receipts'. Paul Skuse accompanied the boy into the ballroom, and there instructed him to place the money on a counter until the deputy marshal had finished his business in the office. When Galvin and Chapman came out of the office, Skuse called out to Chapman, telling him that the box office receipts were on the counter. Galvin was nearer to the bag, however, and making a lunge for it, seized it and carried it off, despite protests from the deputy. About five hundred persons were present in the ballroom at the time. Somewhat later the deputy marshal left the premises without accomplishing his purpose.

"On the evening of October 11, 1938, another attempt was made to satisfy the execution. On this occasion, Deputy Marshal James F. Byrne, together with his brother Edward T. Byrne, and Berkett and Rome, visited the Raymor Ballroom at about 10:00 p. m. Edward Byrne was first sent to buy a ticket, which was found to bear the words 'Raymor-Raymor Ballroom Co.' When Deputy Marshal Byrne approached the entrance of the hall, he saw Galvin stationed outside. Instructing his brother to remain a short way behind, until called, he walked up to Galvin, made known the purpose of his visit and demanded payment of the execution. Galvin suggested that they step inside his private office, but this invitation was refused. The deputy marshal then stepped towards the box office and knocked on the door. When he did this, he was seized by the two special policemen referred to above, the defendants MacLean and Garnett, and held by them. The deputy then sent his brother for the regular policeman on the corner of Massachusetts Avenue and Huntington Avenue, at the same time explaining

Galvin, together with the four subordinate employees previously mentioned, be cited to show cause why they should not adjudged in contempt. In support of this petition the plaintiffs filed five affidavits setting forth with great particularity the sequence of events alleged to have taken place in the ballroom on September 17 and October 11, 1938; defendants were thereby fully and seasonably informed of the nature of the case against them and the evidence they would have to meet. There was no surprise. Citations were issued as prayed and a full hearing was held on March 1, 1939, at which testimony was offered by both sides.

The District Court's decree on the plaintiffs' petition for contempt was rendered July 12, 1939. This decree, which is now being appealed from by the Raymor Ballroom Company and Galvin, was in the following terms:

"Ordered, adjudged and decreed that the defendants Raymor Ballroom Company and Raymond J. Galvin, be and they hereby are jointly and severally ordered to pay to the clerk of this court a fine of six hundred dollars ($600) in or within ten (10) days from the date of the entry hereof; that unless such fine is paid as directed the defendant Raymond J. Galvin is to be committed to jail until the fine is paid or until further order of this court; that the clerk of this court shall pay the net amount of such fine to the plaintiffs when received by him, which amount shall be applied by the plaintiffs in reduction of the amount of the execution which has issued in this suit heretofore; and it is further

"Ordered, adjudged and decreed that the petition for contempt be, and the same hereby is dismissed as against the defendants Ave Galvin Demers, Jack Leonard, David Gannett (David Garnett) and Noah MacLean, without costs against or in favor of any of the parties, but entirely without prejudice to a prosecution for criminal contempt against the defendants Raymor Ballroom Company, Raymond J. Galvin, Ave Galvin Demers, Jack Leonard, David Garnett, Noah MacLean, or any of them."

 The power of federal courts to punish for contempts, whether an "inherent" power or a power derived from the Judiciary Act of 1789, 1 Stat. 83, was limited by the Act of March 2, 1831, 4 Stat. 487, now 28 U.S.C. § 385, 28 U.S.C. A. § 385.[2] Bessette v. W. B. Conkey Co.,

his identity to the special officers. They refused to let him go.

"While the deputy was still held in this manner, Galvin went to the front of the ticket window and was handed a bag of money comprising ticket office receipts, which he grabbed, and despite warnings from the deputy, carried off at a run up Huntington Avenue. This money was not seen again. The deputy attempted to catch Galvin as he ran off, but was prevented from doing so by the two special officers. When Edward Byrne returned with the regular officer, the deputy was released. He then tried again to obtain admittance to the ticket booth, advising the ticket seller, Ave Galvin Demers, of his identity. She refused to admit him, informing him that she knew all the answers and that he was wasting his time. Mrs. Demers then continued to sell tickets, depositing the proceeds upon her person, until about 11:55 p. m., when she was escorted home by the defendant Leonard with the money still on her person. She gave no credible explanation for this extraordinary procedure. At various times during the evening she also sent out large bills in the custody of the employees with the request that they be changed, but no change was forthcoming on these occasions. About 12:45 a. m., the deputy left the premises without having accomplished his errand. On that evening there were at one time about eight hundred people in the ballroom and tickets were sold for sixty-five cents apiece. Accordingly, because of the defendants' conduct, the deputy marshal was prevented on this occasion from reaching box office receipts of at least five hundred and twenty dollars.

"I find that altogether, on both occasions, the amount upon which the officers would have levied exceeded the amount of the execution."

[2] "§ 385. (Judicial Code, section 268.) Administration of oaths; contempts. The said courts shall have power to impose and administer all necessary oaths, and to punish, by fine or imprisonment, at the discretion of the court, contempts of their authority. Such power to punish contempts shall not be construed to extend to any cases except the misbehavior of any person in their presence, or so near thereto as to obstruct the administration of justice, the misbehavior of any of the officers of said courts in their official transactions, and the disobedience or resistance by any such officer, or by any party, juror, witness, or other person to any lawful writ, process, order, rule, decree, or command of the said courts. (R.S. § 725; Mar. 3, 1911, c. 231, § 268, 36 Stat. 1163.)"

**211**

1904, 194 U.S. 324, 326–327, 24 S.Ct. 665, 48 L.Ed. 997; 37 Harv.L.Rev. 1023ff. To sustain the contempt decree in this case it must be found that the conduct of the defendants was a "resistance" to a lawful writ or process of the court, implying a willful purpose to interfere so as to prevent the execution of process. United States v. Jose, C.C., 1894, 63 F. 951, 954; Russell v. United States, 8 Cir., 1936, 86 F.2d 389, 394.

The record amply supports the findings of fact made by the court below. In vital parts, the testimony was uncontradicted. Galvin did not take the stand. It is plain that Galvin intended to forestall the execution of the process. On each occasion, the officers made known their identity to Galvin and their purpose to levy on the box office receipts if payment was not forthcoming. On September 17 Galvin sought to confuse the deputy marshal by making the false statement that the place of entertainment was no longer operated by the Raymor Ballroom Company. While he engaged the attention of the officer in his private office, one of the employees removed from the box office the bag containing the receipts. When Galvin and the officer came out of the private office, Galvin, under the nose of the officer, grabbed the receipts and made off with them. The second occasion was much like the first, though the technique varied in detail. The two special officers held on to the deputy marshal while Galvin grabbed the receipts and disappeared. Though the deputy testified that he showed them his badge and the writ of execution, we are asked to believe that the special officers made a mistake as to his identity. Be this as it may, Galvin was under no such misapprehension, and the special officers were under Galvin's direction and control. Instead of directing them to release the deputy marshal, Galvin took advantage of the situation to run off with the receipts at that juncture. The team play exhibited by the various employees on each occasion indicates a common purpose and a common inspiration.

We believe that the foregoing facts make out a flagrant case of interference to prevent the execution of process. Here the acts of interference took place in the presence of the officers and in respect to property then in view, and defeated a levy of execution immediately impending. Surely the courts are not powerless to deal with such contumacious acts as here took place; otherwise disrespect for the orderly execution of writ and process would become rampant and the efforts of court officers to discharge their duties might with impunity be turned into a burlesque. We have been referred to no cases precisely in point, but the following are suggestive; Lamb v. Cramer, 285 U.S. 217, 52 S.Ct. 315, 76 L.Ed. 715; Clay v. Waters, 8 Cir., 178 F. 385, 21 Ann.Cas. 897; Russell v. United States, 8 Cir., 86 F.2d 389; Lineker v. Dillon, D.C., 275 F. 460; In re Sowles, C.C., 41 F. 752. In Berry v. Midtown Service Corp., 2 Cir., 104 F.2d 107, 122 A.L.R. 1341, it was held not to be a contempt where a judgment debtor pending a stay of execution, by concert between its officers and officers of various affiliated corporations, undertook to make itself execution-proof by transferring its assets. The correctness of this decision need not now be examined, for the case at bar is clearly distinguishable, involving as it does direct acts of interference in the presence of officers about to levy execution.

It is clear that the proceedings under review were for civil contempt. The proceedings were instituted at the initiative of an aggrieved private party who suffered special damage on account of the contempts. McCann v. New York Stock Exchange, 2 Cir., 80 F.2d 211; In re Guzzardi, 2 Cir., 74 F.2d 671. "Reparation to an obstructed creditor, not vindication of the public justice, was the purpose of the fine, and of the fine in all its parts." Fox v. Capital Co., 299 U.S. 105, 108, 57 S.Ct. 57, 59, 81 L.Ed. 67; McCrone v. United States, 307 U.S. 61, 64, 65, 59 S.Ct. 685, 83 L.Ed. 1108; Lamb v. Cramer, 285 U.S. 217, 220, 221, 52 S.Ct. 315, 76 L.Ed. 715. The possibility of future criminal proceedings is expressly reserved in the decree.

Ample precedent sustains the power of the court, in a proceeding for civil contempt, to impose a fine payable to an aggrieved private party as compensation for the special injury he may have sustained. Lamb v. Cramer, 285 U.S. 217, 220, 221, 52 S.Ct. 315, 76 L.Ed. 715; Merchants' Stock & Grain Co. v. Board of Trade, 8 Cir., 201 F. 20, 30. See Kreplik v. Couch Patents Co., 1 Cir., 190 F. 565, 569. The provision in the decree appealed from, that the defendant Galvin is "to be committed to jail until the fine is paid or until further order of this court" is con-

sistent with a civil contempt; the committal to jail is not punishment for a past offense by way of vindicating pub'ic justice, but a means of coercing compliance with the reparation order, an exercise of the familiar power of courts of equity to act in personam. Norstrom v. Wahl, 7 Cir., 41 F.2d 910, 914. See Fox v. Capital Co., 299 U.S. 105, 57 S.Ct. 57, 81 L.Ed. 67; Wilson v. Byron Jackson Co., 9 Cir., 93 F. 2d 577; Campbell v. Motion Picture Machine Operators, 151 Minn. 238, 186 N.W. 787. If Galvin had been prepared to show his utter inability to pay the fine, or to cause the corporation to pay it, the decree, by its very terms, left the way open for an application praying an appropriate modification thereof.

One further objection remains to be noted. We assume that this objection is now open to the defendants, on the record, though this is doubtful. Defendants contend that there is no contempt in resisting an illegal levy; that the threatened levy in this case was illegal because "The box office receipts including as they did the [amusement] taxes due the United States, never having been segregated, were the joint property of the appellant corporation and the United States".[3] It hardly needs to be said that Galvin did not at the time object to the levy on this ground. Under the provision of the Revenue Act referred to, the special fund in trust for the United States embraces only "the amount of tax so collected". Perhaps Galvin, in his solicitude for the public revenue, might have been entitled to ask a segregation of the tax money, but he certainly could not lawfully resist the entire levy. No authority is cited for the extreme claim of immunity here advanced.

The decree of the District Court is affirmed with costs to the appellees.

---

[3] "Enforcement of liability for taxes collected

"Whenever any person is required to collect or withhold any internal-revenue tax from any other person and to pay such tax over to the United States, the amount of tax so collected or withheld shall be held to be a special fund in trust for the United States. The amount of such fund shall be assessed, collected, and paid in the same manner and subject to the same provisions and limitations (including penalties) as are applicable with respect to the taxes from which such fund arose." Internal Revenue Code 26 U.S.C.A. § 3661.

See also Internal Revenue Code 26 U.

S.C.A. § 1718(b):

"Penalties

* * *

"(b) Any person required under this chapter to collect, account for and pay over any tax imposed by this chapter who willfully fails to collect or truthfully account for and pay over such tax, and any person who willfully attempts in any manner to evade or defeat any tax imposed by this chapter or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution."