**PARKER v. UNITED STATES et al.**
(two cases).

Nos. 3695, 3706.

Circuit Court of Appeals, First Circuit.

Feb. 3, 1942.

Rehearing Denied March 16, 1942.

Richard Wait, of Boston, Mass., for appellant.

Charles C. Pearce, Sp. Asst. to Atty. Gen., and John M. Durbin, Sr. Atty., Department of Agriculture, of Washington, D. C. (John S. L. Yost and Margaret H. Brass, both of Washington, D. C., and Edmund J. Brandon, of Boston, Mass., on the brief), for appellees.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

MAGRUDER, Circuit Judge.

The appeal in No. 3695 is from an order of the district court, dated January 27, 1941, adjudging Howard B. Parker in civil contempt and committing him to jail until the Green Valley Creamery, Inc. (a corporation of which he is treasurer and sole stockholder), effects compliance with the Agricultural Marketing Agreement Act of 1937, 7 U.S.C.A. § 671 et seq., and with a mandatory injunction theretofore issued against the said corporation. In No. 3706 the appeal is from an order of the district court, dated May 19, 1941, denying a petition by Howard B. Parker for discharge from commitment following the adjudication of Green Valley Creamery, Inc., as a bankrupt upon its voluntary petition. Pending appeal, it was ordered by the court below that Parker enter into a recognizance with sufficient surety in the sum of $6,000.

On October 1, 1937, the United States of America and the Secretary of Agriculture filed a bill in equity in the court below against the Green Valley Creamery, Inc., seeking a mandatory injunction requiring the defendant to comply with the provisions of Order No. 4, as amended, issued by the Secretary of Agriculture pursuant to the provisions of the Agricultural Marketing Agreement Act of 1937, 50 Stat. 246. The main terms of this Order, which regu-

lates the marketing of milk in the Greater Boston Marketing Area, are summarized in our opinion in Green Valley Creamery, Inc., v. United States, 1 Cir., 1939, 108 F.2d 342, 343, 344.

A temporary injunction was issued by the district court on November 30, 1937. In that decree the defendant was specifically commanded to pay to the market administrator all sums then due or thereafter to become due under the provisions of Order No. 4, as amended, during the pendency of the suit; and further, in more general language, the defendant, its officers, agents, employees, successors, and assigns were enjoined from violating any of the provisions of Order No. 4, as amended, and were affirmatively commanded to comply with all provisions of the said Order, during the pendency of this suit or until further order of the court.

Upon appeal from the interlocutory decree this court issued a supersedeas staying in part the operation of the mandatory injunction, upon condition, however, that the amounts then due or to become due thereafter should, until final determination on appeal of the case on its merits, be paid into the registry of the district court. H. P. Hood & Sons, Inc., et al., v. United States, 1 Cir., 1938, 97 F.2d 677. The moneys were not so paid into the registry, the condition was unfulfilled, and as a result the interlocutory decree remained in effect, and the defendant, its officers and agents, became subject to contempt proceedings for noncompliance with such decree.

The case went back to the district court for trial on the merits, and that court, on March 15, 1939, after confirming the report of a special master, issued its final decree, providing in part as follows:

"4. That the defendant, its agents, officers, employees, successors and assigns, be and they hereby are permanently restrained and enjoined from violating any of the provisions of Order No. 4 as amended by the amendments issued on July 28, 1937, regulating the handling of milk in the Greater Boston Marketing Area.

"5. That the defendant, its agents, officers, employees, successors and assigns, be and they hereby are commanded and directed to comply with all the provisions of Order No. 4 as amended by the amendments issued on July 28, 1937.

"6. That the defendant is hereby commanded and directed to pay within ten (10) days after the entry of this decree any and all amounts heretofore billed to defendant by the marketing administrator under Order No. 4 as amended July 28, 1937, for each delivery period between August 1, 1937, and January 15, 1939, and such further amounts which have not heretofore been paid into the registry of this court but which are now due and owing under the provisions of Order No. 4 as amended by the amendments issued on July 28, 1937, to the market administrator appointed under Order No. 4 as amended, for him to hold and to distribute in accordance with the following paragraphs of this decree."

Appellant Parker lays great stress upon the point that paragraph 6 of the final decree, which is the only part of the decree specifically commanding the payment of money, namely, the sums then due to the market administrator under Order No. 4 as amended, is directed solely to the defendant Green Valley Creamery, Inc. This seems to us of no significance, for "A command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs." Wilson v. United States, 1911, 221 U.S. 361, 376, 31 S.Ct. 538, 543, 55 L.Ed. 771, Ann. Cas.1912D, 558. Furthermore, paragraph 5 of the final decree, which is directed to the corporation, its agents, officers, etc., in more general terms commands them to comply with all the provisions of Order No. 4 as amended. This necessarily includes those provisions of the Order calling for payments to the market administrator then due or to become due in the future, and therefore overlaps somewhat the command in paragraph 6 of the decree.

On the day after handing down its final decree the district court issued a supersedeas staying in part the operation of the final decree, pending appeal to this court, upon condition that the amounts then due and those becoming due thereafter from the defendant to the market administrator under the provisions of the Order should be paid into the registry of the district court to be held pending final determination of the case on appeal. Again, this condition was not fulfilled either in whole or in part, and as a result, the defendant, its officers and agents, became subject to contempt proceedings for non-compliance with the final decree from the date of its issue. On July 21, 1939, this court, before hearing and deciding the appeal, directed that the said supersedeas issued by the district court be

vacated. Green Valley Creamery, Inc., v. United States, 1 Cir., 105 F.2d 754.

On December 15, 1939, this court affirmed the final decree of the district court. Green Valley Creamery, Inc., v. United States, 1 Cir., 108 F.2d 342.

A petition for attachment for contempt was filed by the United States on December 19, 1939, against Green Valley Creamery, Inc., Otis H. Parker and Howard B. Parker for disobedience of and failure to comply with the final decree of the district court. The petition recites that the sum of $22,-849.53 is due by the corporate defendant to the market administrator for the period from August 1, 1937, through January 15, 1939, "but the said defendant Green Valley Creamery, Inc., and the said Otis H. Parker and Howard B. Parker, in contempt of this court, have not paid or caused to be paid such amount either to the market administrator or to the registry of this court." On the face of the petition, it seemed to present the usual situation where the responsible officers of a corporate defendant are sought to be held in civil contempt for failing to take appropriate action within their power to bring about compliance by the corporation with the court decree. However, by agreement of the parties, the contempt petition was referred to a master, on somewhat broader issues. The order appointing the master, May 14, 1940, was as follows:

"This cause came on to be heard, and upon consideration thereof, the court being satisfied that reference to a master is necessary, and by agreement of parties, it is

"Ordered, that this cause be referred to the Honorable Thomas F. Quinn as master to hear the parties and their witnesses, to examine their books, vouchers and evidence, and to report to the court his findings of fact and conclusions of law thereon, the facts found by the said master shall be final when supported by adequate evidence.

"Issues to Be Submitted to Master.

"1. With respect to each of the pay periods as defined in the applicable milk marketing order—

"(a) The amount due the market administrator from Green Valley Creamery, Inc., on its producer settlement account;

"(b) The amount due to the market administrator from Green Valley Creamery, Inc., for marketing service;

"(c) The amount due the market administrator from Green Valley Creamery, Inc., on account of administration expense.

"2. The extent to which Green Valley Creamery, Inc., failed to comply with the following orders of the court:

"(a) The temporary injunction entered November 30, 1937; and

"(b) The final decree entered March 15, 1939.

"3. The ability of Green Valley Creamery, Inc., to have complied with the injunction of November 30, 1937, and the final decree of March 15, 1939.

"4. The extent to which the inability of Green Valley Creamery, Inc., to comply with said temporary injunction and decree was caused by acts of any person or corporation, the particular acts or conduct of each such person or corporation which caused such inability and the extent to which the acts and conduct of each such persons or corporation caused all or any part of such inability.

"5. The legal liability, if any, of Stuart Milk Company to Green Valley Creamery, Inc., arising out of the sale of milk by Green Valley Creamery, Inc., to Stuart Milk Company and the extent of such liability.

"6. All of the acts and conduct of Howard B. Parker and Otis H. Parker or either of them which were in violation of the temporary injunction entered November 30, 1937, and the final decree of this court entered on March 15, 1939.

"7. The prices and amounts paid by Stuart Milk Company to Green Valley Creamery, Inc., for milk purchased by Stuart Milk Company from Green Valley Creamery, Inc., and the fair market value of such milk so purchased."

Thus, though the petition for attachment sought the commitment of the two Parkers to jail until payment to the market administrator of the amounts due through January 15, 1939, the order of reference directed the master to compute all the amounts due to the market administrator, which would carry the computation down through the period ending March 31, 1940, after which Green Valley ceased to be a "handler" of milk subject to Order No. 4 as amended. Also, though the petition referred only to the final decree, the master was directed to inquire into the extent to which the corporation had failed to comply with the interlocutory decree as well as with the final decree; and he

was directed to report the acts and conduct of Howard B. Parker and Otis H. Parker which were in violation of the interlocutory decree and of the final decree. Particularly, he was to report on the extent to which the acts of any person or corporation disabled Green Valley from complying with the interlocutory and final decrees. He was also to inquire into the legal liability, if any, of Stuart Milk Company to Green Valley arising out of the sale of milk by the latter to the former. The Stuart Milk Company was not a party to the original injunction proceedings leading up to the final decree; nor was it made a party to the contempt proceedings.

■ The master made a detailed report which was duly confirmed by the district court. Since the evidence before the master is not included in the present record, we accept as conclusive the findings of fact recited in the master's report.

With respect to the extent of the default by Green Valley, the master found that the total amount due from the corporation to the market administrator on producer settlement account, on account of marketing services, and on account of administration expenses, from August 1, 1937, the effective date of Order No. 4 as amended, to March 31, 1940 (after which period the corporation ceased to be a "handler"), was the sum of $41,722.-37. Green Valley failed to make any payments to the market administrator, or into the registry of the court, as required by the interlocutory and final decrees. Further, the master found that Green Valley "has been made unable to comply with the said temporary injunction and decree by reason of acts of Howard B. Parker and Stuart Milk Company and by reason of the acceptance thereof by the other directors of Green Valley Creamery, Inc., and Stuart Milk Company." These acts of Parker and Stuart Milk Company, so disabling Green Valley, "have been undertaken for the purpose of placing funds and assets beyond the reach of the market administrator, and * * * these acts were carried on for the purpose of hindering and delaying the market administrator."

Stuart Milk Company is a corporation duly organized since 1921 under the laws of Massachusetts. It has a usual place of business in Somerville, Massachusetts, and has been engaged in the business of selling milk to consumers within the Greater Boston Marketing Area. Howard B. Parker is the treasurer, general manager, and a director of Stuart Milk Company and owns 200 shares of its capital stock. The remaining 300 shares are owned by his father, Arthur B. Parker, who is also a director. The third director is Alfred E. Collinson. The business of Stuart Milk Company was dominated by Howard B. Parker; the company, by vote of its stockholders, approved, ratified and confirmed the acts and proceedings of the directors and officers.

Originally, the Stuart Milk Company owned a country plant or receiving station at Passumpsic, Vermont, where it made purchases of milk directly from producers. Had this remained the situation, Stuart would have come under obligation to make payments to the market administrator under the provisions of Order No. 4 as amended. On March 15, 1934, federal regulation of the marketing of milk in the Greater Boston Area was begun by the issuance of License No. 38 by the Secretary of Agriculture under authority conferred on him by § 8(3) of the Agricultural Adjustment Act, 48 Stat. 35. See United States v. Seven Oaks Dairy Co., D.C.Mass.1935, 10 F.Supp. 995. Thereafter, in October, 1934, Green Valley was organized under the laws of Massachusetts with a usual place of business in Somerville, Massachusetts. Within a few weeks thereafter Green Valley purchased the plant at Passumpsic, Vermont, from Stuart for an unknown amount of cash and a $9,000 mortgage. This mortgage was foreclosed early in 1938, after which the said plant went back in the ownership of Stuart, continued to be operated by Green Valley.[1]

All the capital stock of Green Valley was owned by Howard B. Parker, who was its treasurer and general manager, in addition to being a director, and he dominated its business during the entire period in question.

Parker's method of operation is fully set forth in the master's report. Green Valley bought the milk from producers. Its entire product was then sold to Stuart. Parker, as the dominating man in both corporations, dictated the prices at which Green Valley should sell and Stuart should buy. Under the direction and management of Parker the bills from the market administrator to Green Valley were not carried

---

[1] The facts stated in this paragraph appear in the report of the special master in the injunction proceedings, No. 3461. Green Valley Creamery, Inc., v. United States, 1 Cir., 1939, 108 F.2d 342.

as accounts payable by Green Valley, whose operating accounts were balanced without including therein the bills of the market administrator. By Parker's dictation, the prices for milk sold to Stuart by Green Valley "were established and adjusted after disregarding the sums due to the market administrator and the amounts of the bills received by Green Valley Creamery, Inc., from the market administrator." These prices were so nicely set by Parker in 1938 "that the total receipts of Green Valley Creamery, Inc., were maintained at a level substantially sufficient to balance the books of Green Valley Creamery, Inc., without consideration of the sums due from Green Valley Creamery, Inc., to the market administrator." If, however, the amounts due the market administrator are included (as of course they should be) as part of the cost of the milk to Green Valley, it is found by the master that as a result of Parker's domination "Stuart Milk Company was enabled to purchase the entire products of Green Valley Creamery, Inc., for the period between August 1, 1937, to December 31, 1939, at $47,072.65 less than the total costs of such products to Green Valley Creamery, Inc."

The payments by Stuart to Green Valley "were so regulated under the management and direction of Howard B. Parker that Green Valley Creamery, Inc., on December 31, 1939, was insolvent." Further, the master recites:

"Upon all the evidence I find that the policies, acts and dominations of Howard B. Parker have caused the assets and the income of Green Valley Creamery, Inc., to be so held, that Green Valley Creamery, Inc., has been made incapable of paying from the sums or assets now in the possession of Green Valley Creamery, Inc., the amounts due the market administrator.

"I find that the domination and management of Howard B. Parker and the acceptance thereof by Green Valley Creamery, Inc., and Stuart Milk Company, and by the officers and directors of both companies, have made Green Valley Creamery, Inc., immediately and directly unable, from assets now in the possession of Green Valley Creamery, Inc., and noted upon its books of account, to comply with either the temporary injunction or the said decree."

On June 29, 1939, the board of directors of Stuart voted to pay Howard B. Parker a bonus of $10,000 at the rate of $100 per month, and to secure the bonus authorized and directed the execution of a mortgage to Parker upon the real estate and personal property of the corporation exclusive of accounts receivable. Whether the bonus was paid in whole or in part did not appear in evidence. Also, by vote of its directors, Stuart authorized the execution and delivery of an assignment of its accounts receivable (its only remaining unencumbered assets) to Dairy Realty Company, Inc., in order to secure payments under a lease of property from Dairy Realty Company, Inc., to Stuart Milk Company at 40 Lake Street, Somerville, Massachusetts. The offices of Green Valley, Stuart and Dairy Realty Company, Inc., all were located at 40 Lake Street, Somerville, Massachusetts. Dairy Realty Company, Inc., was organized under the laws of Massachusetts on November 7, 1935, and its total issued capital stock was 80 shares, of which 40 shares were owned by Howard B. Parker, and the remaining 40 shares were owned by Otis H. Parker, his brother. On June 29, 1939, by another vote of its board of directors, Stuart authorized and directed the execution of an option to Howard B. Parker to purchase all of its assets at any time within three years from July 1, 1939, for a net sum of $3,600. The balance sheet shows the total assets of Stuart to be $58,148.98, after deducting a questionable depreciation reserve, and shows total liabilities apart from the reserve for repairs and capital stock, of $19,644.78. The master found "upon all the evidence that unless due regard is given to the legal liability of Stuart Milk Company to Green Valley Creamery, Inc., as stated in this report, the price stated in the said option to Howard B. Parker is inadequate."

The master noted that the aforesaid votes of the board of directors of Stuart on June 29, 1939, came shortly after the decision of the Supreme Court in H. P. Hood & Sons, Inc., v. United States, 1939, 307 U.S. 588, 59 S.Ct. 1019, 83 L.Ed. 1478, upholding the Agricultural Marketing Agreement Act and most of the terms of Order No. 4 as amended.

As a legal conclusion from the foregoing facts the master found that there was a legal liability from Stuart to Green Valley "at least to the amount of the total costs of the products handled by Green Valley Creamery, Inc., and purchased by Stuart Milk Company between August 1, 1937, and

December 31, 1939, and that the difference between said total costs of Green Valley Creamery, Inc., and the amounts heretofore paid by Stuart Milk Company during said period, is the total sum of $47,072.65."

Pursuant to a request for findings made by the defendants the master made an additional finding as follows:

"There was no evidence that the relationships between Stuart Milk Company and Green Valley Creamery, Inc., or their business methods with each other, prior to August 1, 1937, or prior to November 30, 1937, were different from the relationships or methods after either of said dates."

Whether these same business methods had resulted in non-compliance with the original Order No. 4, which was effective from February 9, 1936, to August 1, 1936, does not appear. See United States v. David Buttrick Co., 1 Cir., 1937, 91 F.2d 66.

The district court on January 27, 1941, overruled objections by the defendants to the master's report and ordered that the report be confirmed. In a memorandum opinion the court summarized the master's findings, and on the basis of the report concluded that Green Valley and the individuals Howard B. Parker and Otis H. Parker were "in civil contempt of this court." The court's order of commitment dated January 27, 1941, from which order the appeal is taken in No. 3695, is in part as follows:

"Ordered, adjudged and decreed that Green Valley Creamery, Inc., Howard B. Parker and Otis H. Parker be, and they hereby are, adjudged to be in contempt of court by reason of acts alleged in said petition, and it is further

"Ordered that Howard B. Parker be committed to jail until compliance by the defendant Green Valley Creamery, Inc., with the Marketing Agreement Act of 1937 and the mandatory injunction of this court is effected, or until further order of this court, and it is further

"Ordered that the case of Otis H. Parker be continued for disposition until further order of this court."

On March 19, 1941, Howard B. Parker filed in the district court a petition reciting that Green Valley had on the preceding March 15 been adjudged a bankrupt upon its voluntary petition; that by reason of said adjudication Parker was no longer competent as an officer or director of Green Valley to cause the said corporation to comply with the court's decree; that "Your petitioner is not himself indebted in any fashion under said final decree of March 15, 1939, and he is in no wise able to cause or attempt to cause compliance therewith by the defendant Green Valley Creamery, Inc." The prayer of the petition was that the district court "enter a further order discharging the commitment of your petitioner to jail." This petition was denied by the district court on May 19, 1941, without opinion. Appeal is taken in No. 3706 from this order of denial.

We are not clear as to the legal theory upon which the Government would have us affirm the action of the district court. In its brief it asserts that "Green Valley, Stuart and Howard B. Parker were but one entity," and it argues at some length in favor of "disregarding the corporate fiction." The Government in its original bill in equity, seeking a decree enforcing Order No. 4 as amended, might perhaps have proceeded on the theory that Green Valley was but the alter ego of its sole stockholder Howard B. Parker, and that looking behind the corporate façade Parker should be held personally liable as the "handler" obligated to make payments to the market administrator. Or, perhaps the Government might have taken the line that Green Valley was merely a purchasing agent, an instrumentality used by Stuart; and hence that Stuart was the "handler" subject to the Order. But the Government at this time chose to respect the corporate entity of Green Valley, and sought and obtained both an interlocutory and a final decree adjudging Green Valley to be the handler whose primary duty it was to make the payments to the market administrator. It is now too late for the Government to go back of the adjudications of the interlocutory and final decrees. Nor can Parker's commitment be upheld on the argument that Stuart is in contempt of the court's decree and that Parker, as the dominant officer of Stuart, can be put in jail until he causes Stuart to make amends for the consequences of its civil contempt. The reason is that Stuart was not a party to the contempt proceedings and has not been adjudged in contempt.

Further the Government contends that at the time of the decree "there was a debt due Green Valley which was more than sufficient to pay the market administrator"; that as Green Valley was operated and controlled for the profit of Stuart, the lat-

ter, in the eye of equity, became properly indebted to Green Valley for the difference between the total cost of the milk to Green Valley and the amount paid by Stuart to Green Valley, viz., the sum of $47,072.65. On this premise it is argued that it is proper to commit Parker to jail until he, as dominant officer of Stuart, causes Stuart to pay this indebtedness to Green Valley and then until Parker, as dominant officer of Green Valley, causes the latter corporation to apply the assets so derived to satisfy its obligations to the market administrator in accordance with the decree. We find many difficulties with this line of argument. In the first place, Stuart has not been a party to any proceeding establishing such a liability. In the second place, Stuart does not seem to have committed any legal wrong to Green Valley as a legal entity, because the prices for the milk sold to Stuart were fixed by Parker, the sole stockholder and dominant officer of Green Valley; the corporate forms were solemnly observed, and, as found by the master, "Green Valley Creamery, Inc., by votes of its stockholder, approved, ratified and confirmed the acts of its officers and directors." While creditors of Green Valley might have a claim against Stuart on some theory of fraudulent conveyances, Green Valley itself has no enforceable claim against Stuart. Furthermore, even if a liability of Stuart to Green Valley did exist, Stuart would have to pay the debt now to Green Valley's trustee in bankruptcy and Parker would no longer have authority to take the funds so derived from Stuart and pay them to the market administrator in satisfaction of Green Valley's obligations. Therefore, as far as this particular argument goes, whether or not the original commitment of Parker was proper, he would at all events have been entitled to release from commitment upon the supervening event of Green Valley's adjudication in bankruptcy.

There is, we think, another avenue of approach.

■■■ Under the terms of the interlocutory and final decrees Green Valley is the primary obligor commanded to comply with the provisions of Order No. 4 as amended. "A command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt." Wilson v. United States, 1911, 221 U.S. 361, 376, 31 S.Ct. 538, 543, 55 L.Ed. 771, Ann.Cas.1912D, 558. This applies to a civil as well as a criminal contempt. See Alemite Mfg. Corp. v. Staff, 2 Cir., 1930, 42 F.2d 832. Where the responsible officers of the corporation, after notice of the decree, merely fail to take action within their power to cause the corporation to comply with the decree, the officers are in civil contempt, but the obligations of the corporation under the decree do not thereby become the personal obligations of the delinquent officers. United States v. Adler's Creamery, Inc., 2 Cir., 1940, 110 F.2d 482. See Alemite Mfg. Corp. v. Staff, 2 Cir., 1930, 42 F.2d 832; Harvey v. Bettis, 9 Cir., 1929, 35 F.2d 349. The officers may be committed to jail upon civil contempt merely as a means of forcing them to effect compliance by the corporation; and if they can show that the corporation is no longer able to comply with the decree and that its inability is not due to any contumacious acts of theirs, they will be entitled to discharge from commitment. Such is the ordinary situation where corporate officers are committed for civil contempt upon non-compliance by the corporation with a court decree.

■■■ But the situation in the case at bar is quite a different one. Howard B. Parker has done more than merely fail to cause compliance by Green Valley with the interlocutory and final decrees. By a studied course of conduct over a long period of time he has deliberately rendered Green Valley incapable of complying with the said decrees, as indicated in the master's report. From this it does not follow that the obligations of Green Valley to the market administrator become as such the personal obligations of Parker. But to the extent that Parker's contumacious acts have had the intended effect of causing loss to the market administrator by depriving him irretrievably of the fruits of the decrees against Green Valley, the district court has power, in a civil contempt proceeding, to impose a monetary fine upon Parker, payable to the market administrator. The petition for attachment for contempt did not specifically ask for this relief, but it would be appropriate under the terms of the general prayer in the petition."That the plaintiff be given such other and differ-

ent relief as this court deems just and proper." Gompers v. Buck's Stove & Range Co., 1911, 221 U.S. 418, 448, 449, 31 S.Ct. 492, 55 L.Ed. 797, 34 L.R.A.,N.S. 874. In the circumstances disclosed, unless such a fine could be imposed, punishment for civil contempt would be ridiculously ineffective as a remedial process, for it is idle to put Parker in jail to make him cause Green Valley to do something it is no longer capable of doing. The very completeness of Parker's success in bringing about the corporation's incapacity could then be urged by Parker as a reason for relieving him of all civil consequences of his contempt.

■ It is well settled, however, that the court may, in a proceeding for civil contempt, impose the remedial punishment of a fine payable to an aggrieved litigant as compensation for the special damages he may have sustained by reason of the contumacious conduct of the offender. Gompers v. Buck's Stove & Range Co., 1911 221 U.S. 418, 448, 449, 31 S.Ct. 492, 55 L. Ed. 797, 34 L.R.A.,N.S., 874; Lamb v. Cramer, 1932, 285 U.S. 217, 220, 221, 52 S. Ct. 315, 76 L.Ed. 715; Merchants' Stock & Grain Co. v. Board of Trade, 8 Cir., 1912, 201 F. 20, 30; Delaware, L. & W. R. Co. v. Frank, 2 Cir., 1916, 230 F. 988; American Graphophone Co. v. Walcutt, C.C.S.D.N.Y.1898, 86 F. 468; Kreplik v. Couch Patents Co., 1 Cir., 1911, 190 F. 565, 569; Raymor Ballroom Co. v. Buck, 1 Cir., 1940, 110 F.2d 207, 211; Aerovox Corp. v. Concourse Electric Co., 2 Cir., 1937, 90 F.2d 615, 617; Lineker v. Dillon, D.C.N.D.Cal.1921, 275 F. 460, 470, 476.

■ If the district court should impose such a compensatory fine upon Parker and he should fail to pay it within the time specified in the contempt order, the court might, still as part of the remedial process, commit Parker to jail until he pays the fine or until further order of the court. Raymor Ballroom Co. v. Buck, 1 Cir., 1940, 110 F.2d 207, 211, 212. Since the purpose of the commitment would be remedial merely, not punitive, the court would no doubt on application make an appropriate modification of its order if Parker were able to show his utter inability to pay the fine in whole or in part. See In re Byrd Coal Co., Inc., 2 Cir., 1936, 83 F.2d 256.

■ The books of Stuart Milk Company showed small net losses for the years 1937, 1938 and 1939, and the master found that "there was no evidence that Howard B. Parker actually received any money from Stuart Milk Company excepting salary, and the amount of salary did not appear." Whether these apparent losses were genuine or resulted from excessive deductions for depreciation, the master did not determine. Whether Howard B. Parker received the $10,000 bonus previously mentioned also does not appear. Nor do we know how much of the assets drained off from Green Valley flowed through Stuart to the Dairy Realty Company, Inc., and thence to Parker personally. But we need not grope our way through this corporate maze. Parker's obligation to make reparation for the consequences of his civil contempt is measured not by the amount to which he can be shown to have thereby profited personally, but rather by the amount which, as the result of his contumacious acts, he made it impossible for Green Valley to pay the market administrator as directed in the interlocutory and final decrees.

■ The master found that the total amount due from Green Valley to the market administrator for the period from August 1, 1937, to March 30, 1940, was $41,-722.37. He also found that due to the pricing policy enforced by Parker, Stuart purchased the milk from Green Valley from August 1, 1937, to December 31, 1939, at $47,072.65 less than its actual cost to Green Valley. But the latter sum includes losses incurred by Green Valley by reason of prices fixed prior to the interlocutory decree of November 30, 1937. The acts of Parker prior to November 30, 1937, however much they may have contributed to Green Valley's insolvency, are necessarily not in contempt of the interlocutory or final decree. See Ex parte Buskirk, 4 Cir., 1896, 72 F. 14; Berry v. Midtown Service Corp., 2 Cir., 1939, 104 F.2d 107, 122 A.L.R. 1341. In determining the extent of the compensatory fine to be imposed upon Parker, the district court should consider only losses resulting from prices established by Parker after the rendition of the interlocutory decree. On the other hand, the court will be entitled to take into account the further losses resulting from Parker's pricing policy for the period from January 1, 1940, to March 30, 1940, as to which no figures appear in the record before us. Since the fine is compensatory it should as a maximum be no larger than the aggregate amount due the market administrator from Green Valley, with interest.

The order of the district court committing Howard B. Parker for contempt should be amended so as to adjudge specifically that Howard B. Parker is in contempt not only of the final decree, but also of the interlocutory decree, by reason of the acts set forth in the master's report as confirmed by the court. Further, the order should be amended so as to strike out the reference to compliance by Green Valley Creamery, Inc., which has become impossible. As reparation for the contempt, the order should impose upon Parker a compensatory fine, the amount of which will be determined by the court, with due regard to the guides laid down in this opinion. The order will further state that unless the fine is paid to the market administrator within the time specified in the order, Howard B. Parker is to be committed to jail until the fine is paid or until further order of the court.

Since it will be made clear in the amended order that Parker is not being committed to jail to compel compliance by Green Valley Creamery, Inc., with the court decrees, the adjudication of that corporation in bankruptcy becomes of no significance.

In No. 3695 the order of the District Court dated January 27, 1941, is vacated and the case is remanded to that court for further proceedings not inconsistent with this opinion.

In No. 3706 the order of the District Court dated May 19, 1941, denying the petition of Howard B. Parker for discharge from commitment, is likewise vacated, and the case is remanded to that court for further proceedings not inconsistent with this opinion.

#### On Petition for Rehearing.

In a petition for rehearing, appellant Parker observes that the briefs and oral arguments before this court did not deal with the question whether Parker might also be held in contempt of the interlocutory decree. Accordingly we gave leave to appellant to file a memorandum setting forth any reason or reasons why he should not be held in civil contempt of this decree. Such a memorandum has been filed, and an answering memorandum has been submitted by the United States.

■ It is true that the Government's petition for attachment for contempt, filed on December 19, 1939, contained no reference to the temporary injunction. We mentioned this fact in our original opinion, and went on to point out that in the reference to the master the issues were broadened so as to include an inquiry into the extent to which Green Valley Creamery, Inc., failed to comply with the temporary injunction as well as with the final decree, and an inquiry into all of the acts and conduct of Parker which might have constituted a violation of each of these decrees. The issues were fought out before the master on this broader basis and he made his findings and conclusions thereon. Under these circumstances, the narrower scope of the petition for attachment for contempt becomes unimportant. See Rule 15(b), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

■ Appellant urges that we did not consider the effect of two previous contempt petitions, dated respectively December 21, 1937, and January 27, 1938, not appearing in the record now before us, as a result of which, in each instance, the district court entered an order adjudging Green Valley (not Parker) in contempt and imposing a fine of $1,000 upon the corporation. If these were compensatory fines appropriate to civil contempt, and were paid over to the market administrator in reduction of the indebtedness of Green Valley to the market administrator, the district court will of course make corresponding allowance therefor in determining the amount of the compensatory fine to be imposed upon Parker, upon remand of the present case. Apart from this, we think these earlier contempt proceedings have no bearing upon the liability of Parker for contempt of the interlocutory decree, other than to emphasize the persistent and deliberate character of his contumacy.

■ Further, Parker contends, no adjudication for civil contempt of an interlocutory decree can be made after entry of a final decree; "after the entry of a final decree an interlocutory decree becomes functus officio and so ceases to provide the necessary foundation for an order adjudicating a person in civil contempt." No authority cited by appellant, and none that we can find, supports this proposition. It is true, a final decree merges and supersedes the terms of an interlocutory decree so that acts taking place *after* the date of the final decree can be adjudged in contempt only insofar as they may violate the terms incorporated in the final decree. This is all that was decided in Gardner v.

Gardner, 1882, 87 N.Y. 14, cited by appellant. In Worden v. Searls, 1887, 121 U.S. 14, 7 S.Ct. 814, 820, 30 L.Ed. 853, which was a suit for alleged patent infringement, the circuit court imposed a compensatory fine upon the defendants for violation of a preliminary injunction. Thereafter a final decree went in favor of the plaintiff, but on appeal the Supreme Court held that the final decree should be reversed and the bill dismissed. Of course, in these circumstances, the Supreme Court also reversed the interlocutory order of the circuit court adjudging the defendants in civil contempt and imposing a fine upon them payable to the plaintiff, because "the fines were, in fact, measured by the damages the plaintiff had sustained and the expenses he had incurred. They were incidents of his claims in the suit. His right to them was, if it existed at all, founded on his right to the injunction, and that was founded on the validity of his patent." That case furnishes no support to appellant, because in the case at bar the final decree went in favor of the plaintiff and was affirmed by us on appeal. Worden v. Searls is significant, however, as indicating a reason why the district court may find it appropriate to wait until the plaintiff's right in the main litigation has been established by final decree before adjudicating a defendant in civil contempt of an interlocutory decree, and imposing upon him a compensatory fine payable to the plaintiff, on the basis of contumacious acts committed by the defendant while the temporary injunction was in force and before it had been superseded by the final decree. Certainly, the case has no tendency to support the proposition that an adjudication for civil contempt of an interlocutory decree cannot be made after entry of a final decree.

■ Finally, appellant urges that in our original opinion we took no account of § 25 of the Clayton Act, 38 Stat. 730, 740, 28 U.S.C.A. § 390, providing that "no proceeding for contempt shall be instituted against any person unless begun within one year from the date of the act complained of; * * *." That section, must be read in the light of §§ 21, 22, 23 and 24, 28 U.

S.C.A. §§ 386–389, as part of an integrated statute dealing with the punishment for contempt. Sections 21–25 of the Clayton Act were derived from H.R. 22591, 62d Cong., which passed the House in 1912 but not the Senate. See H.Rep. 613, 62d Cong., 2d Sess.(1912). The provisions of that bill, with no substantial changes, became §§ 21–25 of the Clayton Act enacted in 1914. See H.Rep. 627, 63d Cong., 2d Sess.(1914) p. 21.

There are two answers to appellant's contention as to the applicability of the contempt provisions of the Clayton Act to the case at bar.

■ In the first place it is evident both from the legislative history and from the text of the statute that §§ 21–25 as an entirety refer only to punishment for criminal contempt. Michaelson v. United States, 1924, 266 U.S. 42, 64–67, 45 S.Ct. 18, 69 L.Ed. 162, 35 A.L.R. 451; Odell v. Bausch & Lomb Optical Co., 7 Cir., 1937, 91 F.2d 359, 361. The "proceeding for contempt" referred to in § 25 is a separate and independent proceeding at law for criminal contempt. It does not refer to a petition for attachment for civil contempt filed as part of an original equity cause as in the case at bar. See Michaelson v. United States, supra, 266 U.S. at pages 64, 65, 45 S.Ct. 18, 69 L.Ed. 162, 35 A.L.R. 451; Leman v. Krentler-Arnold Hinge Last Co., 1932, 284 U.S. 448, 452–454, 52 S.Ct. 238, 76 L.Ed. 389.

In the second place the one-year period of limitation set forth in § 25, even as to proceedings for criminal contempt, is by the express exception in § 24 rendered inapplicable where the contempt relates to disobedience of any lawful decree "entered in any suit or action brought or prosecuted in the name of, or on behalf of, the United States"—as in the case at bar. United States v. Goldman, 1928, 277 U.S. 229, 237–239, 48 S.Ct. 486, 72 L.Ed. 862; Hill v. United States, 1937, 300 U.S. 105, 108, 57 S.Ct. 347, 81 L.Ed. 537. See also the codification of §§ 21–25 of the Clayton Act in 28 U.S.C.A. §§ 386–390.

The petition for rehearing is denied.